**THATCHER et al. v. CHICAGO RYS. CO. et al. \***

(Circuit Court of Appeals, Seventh Circuit. January 14, 1925.)

No. 3417.

Corporations ⬅152 — Reorganization agreement held not to take away discretion of directors as to declaration and distribution of dividends.

A plan and agreement for reorganization of street railway companies *held* not to take away the discretion of the directors of the reorganized company as to the declaration of dividends, and a provision that their distribution should first be approved by the finance committee *held* valid and binding on those entitled to share therein.

Appeal from the District Court of the United States for the Eastern Division of the Northern District of Illinois; Adam C. Cliffe, Judge.

Suit in equity by Mahlon D. Thatcher, trustee, and others, against the Chicago Railways Company and others. Decree for defendants, and complainants appeal. Affirmed.

For opinion below, see 297 F. 466.

Henry S. Robbins, of Chicago, Ill., for appellants.

James M. Sheean, Francis J. Vurpillat, and Horace Kent Tenney, both of Chicago, Ill., for appellees.

Before ALSCHULER, EVANS, and PAGE, Circuit Judges.

PAGE, Circuit Judge. The District Court dismissed for want of equity the bill of three holders of participation certificates series 1, issued in 1907 pursuant to the reorganization plan of the Chicago street railways. The claim is that one of the defendants, the Chicago Railways Company (called Railways Company) is unconditionally obligated to pay them the annual return alleged to be fixed by the plan.

Through a get-rich-quick scheme of one Yerkes, in which the owners of the north and west side Chicago street railways joined, those properties landed under receiverships in the United States court, with ordinances expired and no right to occupy the streets. Under the compelling lash of the city's refusal to grant any ordinance until all interests were satisfied, a plan accompanied by an agreement (called contract) was submitted and accepted, an ordinance expiring February 1, 1927, was granted, and a reorganization effected. The property was transferred to the Railways Company, organized under the general incorporation laws of Illinois with a common capital stock of $100,000. The plan gave to a committee full power to prescribe the form of the mortgages, notes, bonds, participation agreement and participation certificates, called for by the plan.

In article 3 of the plan, all securities are described:

1. The open first mortgage, permitted by the ordinance to secure money necessary for the large rehabilitation and extension work required by the ordinance.

2. The consolidated or second mortgage. Its three series of bonds, the amount of each series, and the old liabilities to be taken up are shown in:

### TABULATION A.

| | | Consolidated Mortgage Bonds, 5% | Consolidated Mortgage Bonds, 4% to February 1, 1912, and 5% thereafter | | |
|---|---|---|---|---|---|
| | | Series A | Series A | Series B | Series C |
| I. | N. C. Firsts | | 500,000 | | |
| II. | N. C. Seconds, | | 2,500,000 | | |
| III. | W. D. Firsts, | | 4,012,000 | | |
| IV. | N. St. Firsts, | | 634,200 | 2,536,800 | |
| V. | N. St. Refdgs, | | | 1,614,000 | |
| VI. | W. St. Firsts, | | 736,600 | 2,946,400 | |
| VII. | W. St. Consols, | | | 6,317,000 | |
| VIII. | W. St. Cert's, | | | 298,200 | 198,800.00 |
| IX. | Pass'r Consols, | | | 1,306,000 | |
| X. | Tunnels, | | 750,000 | 750,000 | |
| XI. | N. C. Stock @ 180, | | | 449,820 | |
| XII. | W. D. Stock @ 80, | | | 499,680 | |
| XIII. | Pass'r Stock @ 25, | | | 152,575 | |
| XVIII. | Indebtedness, | | | | 4,390,126.58 |
| XIX. | Collateral, | 5,867,200 | | | |
| XX. | Additional Collateral, | 900,000 | | | |
| XXI. | Reserve, | | | 29,525 | 111,073.42 |
| | Totals .... .. ...... | 6,767,200 | 9,132,800 | 16,900,000 | 4,700,000.00 |

*Certiorari denied 45 S. Ct. 509, 69 L. Ed. —.

3. Collateral notes, not here material.

4. The participation certificates in four series, viz.:

(4) "The stockholders of the Railways Company will make the capital stock of the Railways Company, viz., $100,000, the subject of an issue of participation certificates, of which there shall be issued certificates representing in the aggregate 265,100 equal parts, as follows: (a) Series 1, entitled to priority in the distribution of dividends upon the said capital stock or of any dividends or income on or by reason of any other securities which may at any time become subject to the agreement under which said participation certificates are issued, to the extent of $8 for each part represented by said certificates respectively, for each and every year commencing with the year ending August 1, 1908, accumulative until paid, and in the distribution of capital or principal realized from said stock or other securities, to $100 for each said part, before distribution to certificates of any other series."

Like provision is made for series 2, 3, and 4. Each in its order is subordinated to those preceding it. The following, set out in the plan, shows the old stocks, surrendered for the certificates:

tion of any part of such earnings for the benefit of the holders of any series of participation certificates. In the event that any consolidated mortgage bonds of series A or series B shall, under the provisions of No. XVIII of the schedule hereinafter set forth, be issued on account of or to provide funds to pay items in respect of which bonds of series C are allotted in tabulation A of said schedule, then, after the cancellation of all said bonds of Series C which may actually be issued, the aforesaid sinking fund provision and obligation shall continue in force until an amount of said bonds of series A and series B which are equal, in par value, to the bonds of said series A and series B, if any, which may be issued under schedule XVIII, as aforesaid, shall have been redeemed at par, or purchased and canceled; and the said sinking fund shall, after all said issued bonds of series C shall have been canceled, be applied accordingly. *When the full amount of said sinking fund payment shall have been made in any year and any accumulated deficiencies in respect of said payment shall have been met, any remainder of such earnings shall be applied, next, to the payment of $8 for such year, and of any unpaid accumulation for preceding years, in*

## TABULATION B.
### Participation Certificates.
### Equal Parts.

| | | Series 1 | Series 2 | Series 3 | Series 4 |
|---|---|---|---|---|---|
| XI. | N. C. stock at 2.625 | 6,559.875 | | | |
| XII. | W. D. stock at 3.875 | 24,203.25 | | | |
| XIII. | Pass'r stock at .43 | | 2,624.29 | | |
| XIV. | N. St. stock at 1.00 | | 59,200.00 | | |
| XV. | W. St. stock at .625 | | 62,431.25 | | |
| XVI. | U. T. Pfr. at .50 | | | 60,000.00 | |
| XVII. | U. T. Com. at .25 | | | | 50,000.00 |
| XXI. | Reserve, | 36.875 | 44.46 | | |
| | Totals ............ | 30,800.00 | 124,300.00 | 60,000.00 | 50,000.00 |

5. The second mortgage sinking fund provision. It is here set out, and the parts relied on as most important are in italics:

"Sec. 5. The said consolidated mortgage shall provide for a sinking fund of $250,000 per annum, if earned, commencing with the year ending August 1, 1908, which sum shall be applied, annually, solely *to the redemption at par, or to the purchase of bonds of said series C*; and all such bonds thus redeemed or purchased shall be canceled. Said sinking fund shall be cumulative, so that if the full sum of $250,000 shall not be applied as above provided, in any year, the deficiency shall be provided out of the next resulting earnings which would. otherwise be applicable to dividends, before the distribu-

*respect of each equal part represented by participation certificates of series 1.* Next, so long as more than 50 per cent., par value, of said bonds of series C which may be issued by the Railways Company, are outstanding, the sum of $497,022.16 per annum, if earned, and, when not, more than 50 per cent. of said bonds are outstanding, the sum of $621,277.70 (in lieu of said sum of $497,022.16), if earned, shall be distributed pro rata for the benefit of the holders of then outstanding participation certificates of said series 2. The respective sums of $497,022.16 and $621,277.70, per annum, above provided in respect of said participation certificates of series 2, shall be noncumulative. After payment in any year of said

$497,022.16, or of said $621,277.70 (as the case may be), for distribution to the holders of said participation certificates series 2, then any remaining surplus earnings shall be used and applied solely as follows: *Unless the board of directors, with the consent in writing of a majority of the then acting trustees and depositaries or of the sole trustee or depositary under said participation certificate agreement, shall resolve to apply the same to meet the exigencies and financial requirements of the Railways Company, the said remaining annual surplus earnings shall constitute an additional annual sinking fund to be applied in such year to the redemption at par or purchase and cancellation of bonds of series C until the entire issue thereof shall be discharged;* and thereafter, if any of the same shall have been issued as above provided, to the redemption at par, or purchase, of the above specified number of bonds of series A and series B. When all of said bonds of series C and as well any of the bonds of series A and series B to which said sinking fund payment may be applicable as aforesaid, shall have been redeemed, or purchased, and canceled, and when all unpaid accumulations on series 1 have been paid, then any unpaid accumulations in respect of said $8 per equal part represented by said participation certificates series 2, for each year then past, commencing with the year ending August 1, 1908, shall be payable out of the earnings of future years."

The persons sued as depositaries are the successors of the persons named in the participation agreement to whom the capital stock of the Railways Company was conveyed, and who issued the participation certificates, copies of which are set out in full in the participation agreement. It is not urged that the participation agreement added anything to plaintiffs' rights.

The depositaries answered the bill; all other defendants moved to dismiss.

1. There is no prayer for relief against the city of Chicago, members of the finance committee, or Henry A. Blair, as president. The only prayer against Martin J. O'Brien, as comptroller, is that he be directed to do something that the allegations of the bill show that he has never been in a position to do, and there is no charge that he will fail or refuse to do any duty imposed on him by the ordinance. There are allegations that the depositaries have failed to do things that do not seem to be obligatory upon them. In any event, the only prayer for relief against them is that they be ordered to furnish "to this court and said Chicago Railways Company a list of the registered holders of series 1 participation certificates." There is no allegation of any necessity for such list, nor that the depositaries have failed or will fail or refuse to furnish it, if and when necessary.

2. If section 4, supra, was the only provision relating to the certificates, the situation would be that the certificates would be entitled to all beneficial interest in the corporation stock, except the voting power; that is, they would be entitled to all stock dividends and to the proceeds of the stock in any liquidation of the Railway Company's assets. We find in the language of section 4 no intimation of any limitation upon the right and duty of the directors to exercise a sound discretion in the declaration or withholding of dividends, and in the administration of the Railway Company's affairs, generally. The "$8 for each part represented by said certificates," as used in each series, except the last, merely represents the extent of the priorities as between the different series, and is in no sense a guaranty of an amount.

3. Does section 5 aid plaintiffs' contention? Referring to the sinking fund provision in the second mortgage, the participation agreement says: "Said consolidated mortgage embodies provisions limiting the application of the net earnings of the Railways Company to dividends on its stock and thereby the distribution of such dividends to and among the holders of participation certificates issued hereunder." This is supported by the language of section 5. By it the sinking fund of $250,000 per year was to be created solely out of earnings "which would otherwise be applicable to dividends before the distribution of any part of such earnings for the benefit of the holders of any series of participation certificates." No amount could in any event be devoted to dividends until the $250,000 sinking fund was set aside. Thereafter there was a further restriction upon the right of certificate holders to participate in earnings, even if otherwise available for dividends, viz., series 1 was limited to $8 for each of its parts per year, series 2 was reduced to two-thirds or one-half of the amount series 1 could take, depending on the amount of series C second mortgage bonds then outstanding, and, too, it was noncumulative. Series 3 and 4 could take nothing. Those limitations were made so that there could be an additional sinking fund created. We are of opinion that section 5 is a limitation upon the rights of certificate holders and that there is nothing to

indicate any purpose or intention to take away or limit any discretionary power of the directors.

Counsel cite the language in section 5, following the limitation as to certificates series 2, viz.: "Unless the board of directors, with the consent in writing of a majority of the then acting trustees and depositaries or of the sole trustee or depository under said participation certificate agreement, shall resolve to apply the same to meet the exigencies and financial requirements of the Railways Company, the said remaining annual surplus earnings shall constitute an additional annual sinking fund to be applied in such year to the redemption at par or purchase and cancellation of bonds of series C"—and urge that it indicates that the discretion of the directors to declare or not declare dividends has been taken away. From the fact that a right is given to or recognized in a board of directors to determine which of two expenditures, for corporate purposes, shall be made, it is a far cry to the conclusion that a discretionary power, lawfully in a board of directors touching a wholly unrelated matter, has been withdrawn. The contract terms of the second mortgage, made by the Railways Company, might have left out all reference to the board of directors and to any other use of the remaining surplus earnings and have provided at once for the creation of the additional sinking fund. Leaving the matter to the directors and others was merely a concession. Taking away the discretion of a board of directors to distribute or not to distribute company funds among stockholders as dividends is a matter so far removed from that which was under consideration, that we are unable to find in the language cited anything upon which to base a presumption favorable to plaintiffs.

4. Plaintiffs concede that, generally, it is within the legal discretion of directors to say how net earnings shall be disposed of, but say that is true only when there is nothing in its charter or by-laws, or a contract, under which the company has acquired its property, whereby the payment of dividends is prescribed. No by-law or charter provision is brought into question here.

Plaintiffs treat the plan as the contract under which the Railways Company acquired its property. Does it prescribe the payment of dividends? The plan said to the Railways Company: (a) The ordinance and conditions require large expenditures for rehabilitation. You may make an open first mortgage to secure the money for that purpose—and it was done. (b) The old compa-

nies have many debts, some secured, some not, and some of the stockholders should have security for their holdings; therefore, you shall make a second mortgage for all those things, the various items to be secured by a different series of bonds, according to merit—and that was done, to the extent of securing $37,500,000 on $29,000,000 worth of property. Then the plan said to the stockholders of the Railways Company: The Railways Company has assumed for the old companies obligations amounting to 130 per cent. of all property received, and it has nothing more to give, yet here are the stockholders of the old North Chicago City Railway, who have received for their stock series B bonds secured by the second mortgage, to the extent of 180 per cent. of their par value, and stockholders of the old Chicago West Division Railway who have received the same kind of bonds to the extent of 80 per cent. of their par value, and there are stockholders of several other of the companies; you take all of them, and, by a certificate to be issued by you under a participation agreement between you and them, secure to them: (a) All your right to whatever may hereafter be received under any liquidation of the Railway Company's assets; (b) all dividends upon your stock. All that was done by the stockholders of the Railways Company and accepted by all the old stockholders, more than fifteen years ago. Certificates series 1 all went to the holders of the stocks, who were given second mortgage series B bonds. The Railways Company did not directly nor by implication, by any by-laws, by any provision of its charter, or by any contract under which it acquired its property, prescribe the payment of dividends.

5. Plaintiffs treat the plan as self-executing. It was obviously not so intended. Its language is: "The stockholders * * * will make the capital stock * * * the subject of an issue of participation certificates," and that, "Provision shall be made in the agreement authorizing the issue of the participation certificates and defining their rights, etc." And, again, "The participation certificates and the agreement concerning the same shall be in such form," etc. Pursuant thereto, a participation agreement was made between the stockholders (depositaries) "and the holders from time to time of participation certificates issued and to be issued." The form of certificate, therein set out in full and issued by the stockholders to plaintiffs, or their predecessors, and accepted by them, states that plaintiffs are entitled to "an interest in * * * the capital stock" of the Railways Company, and that interest,

so far as income from the capital stock is concerned, entitles them to receive dividends, etc. The only mention of any priority or preference of any kind is: "The holder hereof is entitled, in priority, in every respect, to the rights of the holders of participation certificates of series 2, series 3 and series 4."

Section 5 of the contract provides: "The acceptance by any depositor of the securities of the Railways Company shall estop such depositor from questioning the conformity of said securities in any particular to the plan or this agreement or the propriety or expediency of any act done or arrangement made by or on behalf of the committee or the Railways Company in carrying the plan into effect."

It is not alleged that there was any fraud or mistake in the making of either the participation agreement or the certificates. Plaintiff's rights are defined and fixed thereby, and we find in them no evidence of any intention to limit or take away the discretionary powers of the directors as to any matter.

We find no parallel between the facts in this case and those in Cratty v: Peoria Law Library Ass'n, 219 Ill. 516, 76 N. E. 707. In addition to other differences, it is to be noted that the Library Association had the right to fix its dues, whereas the Railways Company's sole business was to operate a public utility and its dues (fares) were fixed by the ordinance.

6. The bill avers that the first mortgage provides: "The amounts of the earnings of said Railways Company which were properly applicable to the payment of dividends upon the stock of said Railways Company or otherwise distributable to those having interests in said railway stock or the dividends thereon, should not be fixed or distribution thereof made until such distribution should first be approved by said finance committee."

There is no attempt to show action by that committee. On the contrary, it is urged that that clause does not affect plaintiffs' rights because: (a) It was made for the sole benefit of the first mortgage bondholders, who have ample security, and, therefore, there is no necessity for action by the finance committee. That argument falls by its own weight; acknowledged rights cannot be taken away by the simple assertion in argument that they are not necessary. (b) It was not in the plan, and, therefore, there was no authority to put it in the mortgage. The plan gave the committee named in the contract

the power to determine the terms of the mortgage, etc.

In the participation agreement is the following: "It is provided in the plan and hereby expressly declared 'The rights of the holders of participation certificates shall be in all respects subject to the prior rights of the holders of bonds and collateral notes to be at any time issued under the aforesaid first mortgage, consolidated mortgage and collateral note agreement.'"

Plaintiffs are estopped to urge such a contention. (c) Such a veto power in the finance committee would nullify the power conferred by law on the directors and would be illegal. This is a strange argument from plaintiffs who base their whole case on the proposition that the plan took away all discretion of the board of directors pertaining to the same matter. We are of opinion that so far as plaintiffs are concerned the discretion vested in the finance committee is a valid and binding provision.

The decree is affirmed.