### JAMESON et al. v. GUARANTY TRUST CO. OF NEW YORK et al.

Circuit Court of Appeals, Seventh Circuit. July 22, 1927.

No. 3897.

1. Railroads ⬅➡30—Railroad reorganization plan held not to favor stockholders, though bondholders took 80 per cent. of new holdings in junior adjustment bonds.

Reorganization plan of railroad *held* not to give stockholders unfair advantage over holders of refunding bonds, in view of need for ready cash, which stockholders paid, notwithstanding that bondholders received only 20 per cent. of new bondholdings in prior mortgage bonds, remainder being taken in junior adjustment bonds having 5-year noncumulative interest feature, which were, however, superior to stock, since in reorganization each interest need not be accorded same rank it formerly held in every particular.

2. Railroads ⬅➡30—Railroad reorganization plan held not unfair for admitting bonds secured by property of division to further security.

Reorganization plan of railroad, which admitted bonds secured by western division of road to further security of other property, admitting such bonds on equal basis with refunding bonds of road, *held* not unfair as favoring such bonds as against refunding bonds, where latter were admitted to further security of western division property.

3. Railroads ⬅➡30—Railroad reorganization plan held not to favor government in payment of note secured by bonds which had decreased in value.

Reorganization plan of railroad *held* not to favor United States government unduly in treatment of $20,000,000 note secured by $32,-000,000 of refunding bonds, by providing for payment in cash of $17,000,000 principal and $2,700,000 interest, and balance of $3,000,000 principal in preferred stock, notwithstanding decreased value of refunding bonds held as security, in view of government's possession of mail-carrying earnings and of securities, and of comparative smallness of amount proposition involved.

4. Railroads ⬅➡30—Decree confirming railroad reorganization modified, to provide for court's approval of time for terminating bondholders' option to take new bonds.

Decree overruling objections to reorganization plan of railroad, approving plan, and confirming sale of mortgaged property, *held* modified, to make provision for approval by district court of any limit of time thereafter to be fixed by reorganization managers for terminating bondholders' option to deposit refunding bonds and take new bonds under reorganization plan.

5. Railroads ⬅➡30—Fixing time within which railroad bondholders must deposit bonds under reorganization plan did not constitute coercion, making plan unlawful.

Reorganization plan of railroad *held* not unlawful, on ground that methods used coerced bondholders into depositing bonds under plan, though times were set within which to make deposit.

6. Railroads ⬅➡30—Validity of railroad reorganization plan held not affected by refusal to permit bondholders to intervene in proceedings for sale of railroad's mortgaged property.

Validity of reorganization plan of railroad *held* not affected by refusal of District Court to permit bondholders to intervene and be heard on certain issues in proceedings leading to sale of railroad's mortgaged property, where right to be heard was distinctly reserved by decree of foreclosure in event property was bid in

pursuant to reorganization plan, and only objectors were fully heard after sale when plan was presented to court.

**7. Railroads ⬅⟶30—Approval of railroad's reorganization plan by majority of bondholders is entitled to weight in determining fairness of plan.**

In determining whether reorganization plan of railroad was fair and equitable, fact that great majority of bondholders approved plan is entitled to much weight.

Appeal from the District Court of the United States for the Eastern Division of the Northern District of Illinois.

Consolidated suits by the Guaranty Trust Company of New York and others against the Chicago, Milwaukee & St. Paul Railway Company and others, in which Edwin C. Jameson and others, constituting the bondholders' defense committee, filed objections to the reorganization plan of the railroad and to the confirmation of sale of mortgaged property. The District Court overruled the objections, approved the plan, and confirmed the sale, and Edwin C. Jameson and others appeal. Affirmed.

See, also, 13 F.(2d) 129, 15 F.(2d) 434, 443.

March 18, 1925, on bill filed by creditors, the District Court appointed receivers for the Chicago, Milwaukee & St. Paul Railway Company (hereinafter called Railway), the Railway consenting thereto. Defaults having occurred in two certain mortgages upon property of the Railway, suits to foreclose them were instituted, which were consolidated with the first-named action, and same receivers appointed therein.

The two mortgages referred to are: (a) The Railway's "general and refunding mortgage" (the bonds whereunder we call "refunding bonds"), which is a lien upon its Eastern lines and some of its branch Western lines, subject to a prior underlying mortgage securing bonds for $181,000,000 (round numbers will be used) on the Railway's Eastern lines, which remains undisturbed as a prior lien thereon, and is also a lien upon 85 per cent., or $154,000,000, of an issue of bonds under the hereinafter mentioned "Puget Sound" mortgage. Of the refunding bonds, $202,000,000 (which does not include $73,000,000 of the bonds held by the United States government as collateral security) are outstanding in the hands of the public. (b) The "Puget Sound" mortgage, which is a first lien upon the Railway's Puget Sound lines, consisting of about 2,500 miles of railroad west of Mobridge, S. D. Of the bonds secured by this mortgage, $26,000,000 are in the hands of the public.

The Railway owes the United States government $55,000,000 and interest, evidenced by three notes, of which the Secretary of the Treasury holds two, aggregating $35,000,000, securing which are $18,000,000 of the underlying mortgage bonds and nearly $41,000,000 of the refunding bonds. The other note, for $20,000,000, was given to the Director General of Railroads, and is secured by $32,000,000 of refunding bonds. June 1, 1927, the accrued unpaid interest on this note was $2,700,000.

Reorganization managers were constituted, who prepared and, on June 1, 1925, submitted to the various bondholders, stockholders, and others in interest, a reorganization plan, with invitation to them, if consenting and approving, to deposit their securities with specified depositaries, for such action as is contemplated by the plan. Objections to certain features of the plan resulted in modifications therein which were made the following November.

The plan and agreement of organization are long and complicated instruments; the salient features of the plan bearing on the questions here involved being, in substance:

(a) The foreclosure of the refunding and Puget Sound mortgages and sale thereunder, subject to the underlying mortgage, and upon the foreclosure sale, the property to be bid in (if the bid proves successful) for and on behalf of a new railroad company to be organized, having preferred and common stock.

(b) The holders of the refunding and the Puget Sound bonds to receive, in exchange at par for the old bonds, 20 per cent. thereof in new 50-year 5 per cent. mortgage bonds at par with fixed interest, to be issued by the new company, and for the remaining 80 per cent. of their old bonds at par new 75-year 5 per cent. convertible adjustment mortgage bonds at par, to be issued by the new company, wherein the interest is in part dependent upon the net income of the new company, and is noncumulative until 1930, with provision for devoting to improvements on the property, from net earnings of the company, up to $5,000,000 annually before payment of interest. During the noncumulative interest period of the adjustment bonds the voting power for choosing directors is given to certain voting trustees and their successors, to be approved by the bondholders; the adjustment bonds to be secondary to the 50-year 5 per cent. mortgage bonds, and at any time before maturity convertible, at holder's option, into stock of

the new company at the rate of five shares of each of preferred and of common stock for each $1,000 par of adjustment bonds.

(c) The preferred and common stockholders of the old company to pay in cash to the new company at the rate of $28 for each share of preferred stock, and $32 for each share of common stock held, and to receive from the new company its preferred and common stock respectively, share for share, of their old stockholdings; and to receive also of the new 50-year 5 per cent. mortgage bonds, at par, $24 for each $28 so paid in, and $28 for each $32 so paid in; the contribution of the stockholders for which no security is received other than the new stock thus being at the rate of $4 per share of their stockholdings, plus whatever less than par the new 50-year 5 per cent. mortgage bonds are worth. The estimated total of about $70,000,000 in cash thus furnished by the stockholders to be used for making the cash payment to settle the indebtedness to the United States, and for capital outlays, equipment, improvements, and working capital for the new company, and expenses of the receivership and reorganization.

(d) The indebtedness to the United States to be adjusted thus: The notes for $35,000,000 to be paid in cash; the $20,000,000 note to be paid, $17,000,000, with interest to date of settlement, in cash, and $3,000,000 in preferred stock, at par, of the new company, and all the bonds securing the notes to be surrendered.

(e) Unsecured creditors to receive, for their claims, preferred stock at par, of the new company.

(f) Nondepositing bondholders to receive for their bonds, in cash, their ratable part of the proceeds of the foreclosure sale under the bid at which the property shall have been sold.

(g) Provision is made for a new first and refunding mortgage, to be superior to the 50-year 5 per cent. and the adjustment mortgages, but no bonds thereunder to be issued as part of the reorganization plan; the purpose of this mortgage being to enable the new company, if and when necessary, to raise funds to be used only for making improvements on the property.

In the decree of sale it is provided that, if the property be bid in pursuant to any plan of reorganization, the plan shall be submitted to the court before confirmation of the sale, and all parties in interest may be heard, before confirmation, respecting the fairness of the plan. In pursuance of the plan, the property, subject to the underlying lien, was bid in for $140,000,000. Appellants, constituting a bondholders' defense committee acting for about 70 of the holders of refunding bonds to the amount of about $18,000,000, filed objections to the reorganization plan, and to confirmation of the sale, and evidence thereon being heard, the District Court overruled the objections, approved the plan, and confirmed the sale.

Nathan L. Miller, of New York City, for appellants.

Robt. T. Swaine, of New York City, for Robt. T. Swaine and others.

Horace Kent Tenney, of Chicago, Ill., for appellee Guaranty Trust Co. of New York and Calloway, trustee.

Ralph M. Shaw, of Chicago, Ill., for appellees receivers.

Mitchell D. Follansbee, of Chicago, Ill., for appellee Bankers' Trust Co.

G. M. Peters, of Chicago, Ill., for appellee Farmers' Loan & Trust Co.

Before ALSCHULER, PAGE, and ANDERSON, Circuit Judges.

ALSCHULER, Circuit Judge (after stating the facts as above). The questions involved in this appeal may be best stated as they are in appellants' brief, under the title of "Contested Issues," and in that order considered:

"(1) The first important issue involved in the appeal is as to the distribution of the new securities as between stockholders and bondholders, and turns upon a question of law as to the correct interpretation of the principle established in the case of Northern Pacific Railway Co. v. Boyd, 228 U. S. 482, 33 S. Ct. 554, 57 L. Ed. 931.

"(2) The second important contested issue is as to the distribution of the securities as between refunding and Puget Sound bonds.

"(3) The third important contested issue is as to the treatment of the note for $20,000,000 held by the Director General of Railroads.

"(4) A fourth issue is as to the right of appellees to exclude appellants from participation in the plan before final approval of the plan by the Interstate Commerce Commission and the courts.

"(5) Finally, appellants claim that, quite apart from the lawfulness of specific provisions of the plan, the plan as a whole is unlawful because of the methods used in coercing bondholders into depositing their bonds

under the plan, in depriving dissenting bondholders of a hearing upon the issues which arose upon the sale of the property, and in conducting the proceedings in the interest of stockholders and Puget Sound bondholders, and because the proceedings leading up to sale were vitiated by the refusal of the District Court to permit appellants to intervene and be heard upon these issues."

[1] 1. The facts in Northern Pacific Railway Co. v. Boyd are so essentially different from those here as to make it difficult to follow appellants' contentions respecting that case. Generally speaking, it there appeared that a corporation which had become liable on an unsecured claim suffered a foreclosure of its property to take place pursuant to a reorganization plan whereby, through a foreclosure sale, a new company took over the property of the old, the stockholders of the old company becoming the stockholders in the new, but without any provision whatever in the reorganization plan to take care of the general creditors of the old company. The plan here makes elaborate provisions for protection in the new organization of the refunding bonds, as will be later considered, giving the bondholder the alternative of taking his proportionate share of the proceeds of the foreclosure sale, with abundant notice to the creditors, and opportunity to be heard, all of which was entirely wanting in the Boyd Case.

This objection is, however, predicated primarily upon the contention that, as between the refunding bonds and the stock, the reorganization plan gives to the latter, in the new corporation, a material and unfair advantage over the former as compared with their respective places in the old. It is reasoned that the plan requires the reorganization bondholders to make unfair sacrifices which benefit the stockholders, and that the latter are given rights unfairly disadvantageous to these bondholders.

It is urged that the terms upon which the old stockholders may exchange for stock in the new company are entirely too favorable to the stockholders. The plan provides that they must pay in cash $28 and $32, respectively, per share of their preferred and common stock held, receiving like amounts of new preferred and new common shares, and $24 and $28 respectively in 50-year 5 per cent. mortgage bonds of the new company. The cash absolutely contributed by the stockholder is this difference of $4 per share. Whether or not the stockholders could have been induced to pay a materially larger sum,

rather than sacrifice their stock, whose market price at that time was quite negligible, is and must always be problematic; for when a deal is once closed it usually cannot be known whether either party might have succeeded in driving a better bargain.

There was concededly sore need for ready cash to settle the government claim, and for capital and other purposes, and we cannot, under the circumstances, conclude there was any degree of unfairness in failing to require the stockholders to pay more. But the contribution cannot be said to have been only the $4 per share, unless we can say that at that time the bonds they were to receive for the further advance of $24 and $28 per share were worth par—which, considering the large underlying bond issue on lines East, and the further capital requirements which would also become a prior obligation, is extremely improbable. An estimate of 80 has been made of their market value, but, whatever is their value less than par, it is, by that difference, a further contribution by the stockholders upon the faith that at some time the wisdom of the investment may be vindicated.

That the 50-year 5 per cent. mortgage bonds are given priority over the adjustment bonds to be issued to refunding bondholders is not, in our judgment, a matter of which the refunding bondholders can properly complain. It could hardly be expected that this new money needed by the new company could be raised upon its mere promise, or upon a lien of rank junior or equal to that of the adjustment bonds.

As was said by the Supreme Court in Kansas City, etc., Co. et al. v. Central Union, etc., Co., 271 U. S. 445, 46 S. Ct. 549, 70 L. Ed. 1028: "But it does not follow that in every reorganization the securities offered to general creditors must be superior in rank or grade to any which stockholders may obtain. It is not impossible to accord to the creditor his superior rights in other ways. Generally additional funds will be essential to the success of the undertaking, and it may be impossible to obtain them unless stockholders are permitted to contribute and retain an interest sufficiently valuable to move them. In such or similar cases the chancellor may exercise an informed discretion concerning the practical adjustment of the several rights."

But the advantage of the prior 50-year mortgage bonds is not wholly with the stockholders, who were "moved" to make this substantial cash advance. The modified plan provides that each refunding bondholder

shall receive 20 per cent. of his bondholdings in these same 50-year bonds, whereby to that extent these bondholders are co-ordinate in security with those who provide this new money. But it is urged that the percentage of new 50-year bonds to be given in exchange for refunding bonds should be not less than 40. Thus again we have the same question whether stockholders would have made the advance if the security therefor were further diluted by the larger issue of the 50-year bonds which would thus become necessary. In the plan as first submitted, the refunding bondholders were to receive adjustment bonds only. Upon objection of refunding bondholders, notably those of the so-called "Roosevelt" committee, representing about $20,000,-000 of the bonds (all but about 5 per cent. of them refunding bonds), modification was made to provide for the 20 per cent. of the 50-year bonds to the refunding bondholders. Surely the 20 per cent. going to the refunding bondholders did not injuriously affect their security in the new company, and those going to the stockholders, being for necessary cash and at par, did not unduly or unfairly disturb the relative status.

Respecting the 5-year noncumulative interest feature of the adjustment bonds, it is contended that in so far as the interest is not paid, or in any other respect the plan fails to realize for the refunding bondholders full payment of their bonds, with interest, it is by so much a contribution by the bondholders, to the advantage of the stockholders. And in this manner it is figured that these bondholders are contributing a great sum, of which the ultimate advantage is with the stockholders.

While it is true the refunding bondholders make concessions to the extent of possibly all the interest accruing for 5 years until 1930, and after 1930 the possible deferring of part of their interest in favor of permanent improvements (the unpaid interest after 1930 to accumulate), as well as inferiority as to certain new bond issues, this is not a contribution in the same sense as new money paid into the company by those under no lawful obligation to supply it. If the railway's assets were such as reasonably to assure prompt, full payment of the refunding bonds and interest, concessions by the bondholders would be more nearly equivalent to cash contribution by them. But where, as here, the strong probability is that foreclosure sale in the ordinary way, without some fair plan for reorganization of the property, would realize these bondholders but small proportion of their full claims, concessions therein for the purpose of reorganization, in the hope that ultimately most of the debt will be realized, cannot be regarded as the equivalent of cash contributions.

Respecting the interest concession until 1930, which includes the period of receivership, it may be said that, when the plan was submitted to the bondholders, it was not certain whether the revenue would admit of payment of interest during that period, and the experience so far has been that it would not, and this will likely be the experience until 1930. It was deemed wise during this time not to burden the new company with responsibility for the unpaid interest of that period, and therefore it was not made cumulative. Beginning 1930, interest remaining unpaid by reason of devoting a certain proportion of earnings to capital improvements will accumulate. While it is true that capital improvements thus made before and after 1930 may ultimately benefit the stockholders, logically this can happen only after they have first so improved the security for the bonds as to assure their payment in full—in other words, the realization of all the benefits to the bondholders contemplated by the plan. As between all these interests, whatever remains after all obligations are cared for inures to stockholders, as indeed it should.

In this connection we call attention to a reference in brief for appellants to the fact that, since the reorganization plan has been so generally approved by those in interest, the market quotations on the stock have increased in greater proportion than the market quotations on the refunding bonds—this as persuasively illustrating that the stockholders have been favored at the expense of the refunding bondholders. But the relative advantages are not properly to be measured in proportions. It is true the market price of the stock has substantially increased from a very low figure when the receivership began. If it sold at 5 at that time, and advanced to 15, it would be threefold. Bonds then worth about $50 could not possibly increase in value in that proportion, since par, or thereabout, is all that any well-secured bond would be worth, save that under possibly exceptional circumstances, such as long time, with large interest, or convertibility into something more profitable, they might be worth somewhat more. But the fact is that since the reorganization plan the refunding bonds have also very materially increased in market price, so that undoubtedly the major portion of those represented by the Jameson

committee could be sold at very substantial profit over their purchase price.

Another modification which was made in the plan was for conversion of adjustment bonds at par, at any time, at option of holder, into equal parts of preferred and common stock; so that, if it comes to pass that it would be more advantageous to hold 5 shares each of the preferred and common stock than $1,000 of adjustment bonds, the bondholder will be at liberty to exchange. To what, if any, degree this option is a factor in the largely increased market price of the bonds we cannot know; but certain it is that, if the faith and hope of the stockholders should be realized, upon which they were willing to advance this large amount of new capital, and the stock should again approximate its once high market price, these refunding bondholders are privileged to share in the profit.

The Boyd decision does not require that in the reorganization each interest must be accorded the same rank in every particular it formerly held. The most it holds is that the stockholder's interest in the old company may not, as against unsecured creditors, be carried into the reorganized company, and these creditors wholly disregarded. The court said: "This conclusion does not, as claimed, make it necessary to pay an unsecured creditor in cash as a condition of stockholders retaining an interest in the reorganized company. His interest can be preserved by the issuance, on equitable terms, of income bonds or preferred stock. If he declines a fair offer, he is left to protect himself as any other creditor of a judgment debtor, and, having refused to come into a just reorganization, could not thereafter be heard in a court of equity to attack it."

The principle is alike applicable to other interests which are superior to the stock, none of which in the reorganization may be wholly disregarded, or otherwise inequitably treated. Here the adjustment bonds remain, as were their predecessors, superior to the stock. The concessions as to interest, through its non-cumulation until 1930, and the making of improvements and additions from part of the revenues, may be of benefit to the stock, but have primary advantage to the adjustment bondholders, whose security is thereby improved. The 20 per cent. participation in the 50-year bonds, 80 per cent. par whereof represents an equal amount of new money to the reorganized company, and the right of conversion into stock, are also of advantage to refunding bondholders.

As between the stock and the refunding bonds, the advantages of the plan to the latter, in our judgment, will approximately balance whatever concessions the plan requires of them; and, the stock remaining, as before, subordinate to the bonds, we do not see wherein the plan unfairly or inequitably gives material advantage to the stock over these bonds.

[2] 2. This issue rests on the alleged advantage in the plan, of Puget Sound bonds over refunding bonds. Upon this, elaborate and intricate statements, charts, graphs, and computations were presented, and much expert testimony adduced, showing revenues, profits, losses, and earning power of the lines East and lines West, respectively, and the strategic value of each to the other, and their prognosis in these respects, all with a view to showing the value of the security behind each of the bond issues. All of this we have considered to the best of our understanding, and from this we reach no definite result.

The outstanding holdings of these issues participating under the plan are the $26,000,000 of Puget Sound bonds and $202,000,000 refunding bonds. The status of the refunding bonds respecting the Puget Sound property is equality with the Puget Sound bonds to the extent ($155,000,000) that Puget Sound bonds are pledged to secure the refunding issue, leaving in effect $47,000,000 of the refunding bonds (exclusive of the $73,000,000 held by the government) without security on the Puget Sound property, but only on the lines east. The outstanding $26,000,000 of Puget Sound bonds were not secured on the lines east. The plan admits the $47,000,000 of refunding bonds (also the $73,000,000 thereof, if redeemed from the government and thereafter issued) to the further security of the Puget Sound property, and the $26,000,000 of the Puget Sound bonds to the further security of the refunding property. We are unable to see wherein, through this arrangement, Puget Sound bonds have materially larger benefit through being admitted to share in security on the refunding property than accrues to the refunding bonds through $47,000,000 thereof (and perhaps $73,000,000 more of them) sharing in the security on the Puget Sound property.

We do not follow appellants' contention that this issue may be determined by the upset prices ($42,500,000 on Puget Sound and $67,500,000 on refunding property) fixed in the decree of foreclosure upon sale of the property, and cannot see why this of itself should determine the comparative value of the two bond issues, varying as they do so greatly in amount outstanding, as well as oth-

er conditions bearing upon their value. If the two classes of bonds were of equal value, objection to their similar treatment would not likely be suggested.

In this connection it is very significant that one of appellants' witnesses testified that at the time of the receivership the two issues of bonds were selling in the market at nearly the same price—one point difference in favor of the refunding bonds—from which fact the witness said it would be fair to assume that the general market opinion then was that their value was about the same. All these things, as well as the great desirability of avoiding controversy between these two parts of the same great railroad system, or of incurring danger of their ultimate disruption, in our opinon dispels the conclusions of unfairness or inequity of the plan toward the refunding bonds in admitting on equal basis with them the $26,000,000 of Puget Sound bonds.

[3] 3. It is next objected that by the plan the United States government is unduly favored in the treatment of its $20,000,000 note, secured by $32,000,000 of the refunding bonds. The plan is payment in cash of $17,000,000 principal and $2,700,000 of interest, and the balance of $3,000,000 principal in preferred stock. Payment of cash to the extent of the value of the security would not, of course, be objectionable, and if this security were worth in the market say 50, or $16,000,000, it might be said that in this respect the United States is favored to the extent of $3,500,000 in cash. It does not substantially affect the status of the complaining bondholders that preferred stock is also given the government.

But other considerations enter into this adjustment. The government holds also notes for $32,000,000, which under the plan are paid in cash. They are secured by $18,-000,000 of the underlying bonds and $41,-000,000 of refunding bonds. All this security is in the possession of the government, which is claiming the right to set off, against any surplus of security over the debt, its claim for any balance on the other note. And besides this it is withholding and asserting claim to about $1,800,000, which had theretofore been earned during the receivership for carrying the mails, as well as such future earnings. With the merits of these claims we are not deeply concerned. The government had possession of all these securities, as well as the mail-carrying earnings up to that time, with more to accrue; and if, with this position of vantage on the part of the government, the reorganizing managers in good faith proposed thus to adjust these differences with the government and release these securities, we cannot say it was bad business policy, or that even remotely it indicates unfair or inequitable treatment of the refunding bondholders. Besides, the comparative smallness of the real amount which this proposition involves—the deficiency of the security to pay this debt—makes quite negligible its bearing upon the many millions involved in the plan.

[4] 4. That feature of the plan and decree is assailed which allows the reorganization managers to limit the time within which the old bonds must be deposited in order to permit them to participate under the plan. It is hardly possible that each and every security holder can be reached or will act, and it is apparent that at some stage a time should be fixed beyond which holders of securities may not exercise their option to deposit and to take under the plan. Appellants contend that pending their appeal their right to deposit should not be cut off, and appellees maintain that bondholders should not be permitted to speculate on the result of the litigation, retaining indefinitely the option to take bonds under the plan, or cash under the sale in case of unfavorable outcome of this appeal.

Suffice it to say appellees' counsel have openly disclaimed all intent to cut off the exchange right of appellants' bondholders by reason of the appeal, and appellants' counsel, with virtuous protestation not less fervent, disclaim all intent to speculate, but several times have proposed before this court to bind their clients, in case their appeal is unsuccessful, to take new bonds under the plan, wholly regardless of what the market price of the bonds may then be, and this proposal or assertion is repeated, in somewhat modified form, in their printed brief. With such unanimity of righteous intent it is scarcely conceivable that, pending this litigation, and for a reasonable time after its termination, either party will, in this respect, seek any undue advantage of the other. The objection affects the manner of carrying out the plan, rather than the plan itself, and to allay all fear of oppressive or speculative action the decree may be modified to make provision for approval by the District Court of any limit of time thereafter to be fixed by the reorganization managers for terminating the option to deposit refunding bonds and take new bonds.

[5] 5. This specification is as inclusive as the common counts of a declaration in assumpsit, and about as specific. The plan, as a whole, is stated to be unlawful:

Because (a) of the methods used to coerce bondholders to deposit bonds under plan. We fail to find in the record anything which suggests such coercion, or any wide or unconscionable departure from the course usually followed in such cases. True, times were set within which to make deposit; but this is not only customary, but necessary. If there was, in fact, coercion, it would seem that appellants alone, who were not depositors under the plan, were the only ones who were aware of it, since of the thousands of depositors under the plan it does not appear that any one has undertaken to withdraw.

Because (b) depriving dissenting bondholders of a hearing upon the issues upon the sale of the property. While we find nothing in the record which in our judgment indicates any unlawful deprivation in this respect, this does not bear upon the issue of lawfulness or the equity or fairness of the reorganization plan.

Because (c) of conducting the proceedings in the interest of the stockholders and Puget Sound bondholders. This we have considered above, and determined adversely to appellants.

[6] Because (d) the proceedings leading up to the sale were vitiated by the refusal of the District Court to permit appellants to intervene and to be heard on those issues. In so far as this refers to the reorganization plan, which is alone here in issue, appellants' right to be heard thereon was distinctly reserved by the decree of foreclosure, in the event that the property was bid in pursuant to any reorganization plan. The court could not have known in advance who would be the successful bidder, and, if not bid in pursuant to this or some other reorganization plan, no occasion would have arisen for a hearing upon the merits of any such plan. After the sale was made and the plan presented to the court, abundant opportunity was afforded for objection to the plan, and for hearing thereon, and it appears that appellants, representing the only objectors, were fully heard, in the District Court as well as here.

[7] Upon the hearing much evidence was given, and there and here much discussion presented respecting the personnel of the bondholders' committees, and of the reorganization managers, with a view of thereby impeaching their actions and tainting the plan, as well as the deposits of securities made thereunder. Upon review of all this, we are convinced that whatever of possible bias or impropriety such interest might suggest is far outweighed by the significant fact that, as against over 20,000 individual bondholders depositing under the plan (about 17,000 of whom were refunding bondholders, with aggregate holdings of about $172,000,000, or nearly 85 per cent. of the outstanding issue), appellants, representing about 70 of the refunding holders, alone make objection to the plan, and to confirmation of the sale, and these, including some of the large holdings, represent only about $18,000,000, or about 8 per cent. of the outstanding issue. While in such matters majorities do not govern, the approval thus signified by this vastly greater number, whose interests are identical in kind with those of the objectors, is entitled to much weight in determining whether or not the plan is equitable and fair.

In this connection we refer to the fact that of the $18,000,000 refunding bonds of these objectors, $3,500,000 are held by appellant Jameson personally, and $9,500,000 by a fire insurance company of which he is president, and that of the last amount only $1,800,000 had been acquired by it before January, 1924, $2,500,000 it purchased during 1924, and $5,250,000 during 1925—$500,000 of the last-named sum since the receivership commenced. By far the larger part of both holdings was acquired after the railway's financial difficulties were apparent, and at average prices around 55. And it is at least interesting to recall, as was above referred to, that, since the promulgation and general approval of the plan, refunding bonds have gradually risen in market price, until considerably in excess of prices prevailing for some time before and after the receivership began.

With the above suggested modification in the decree to provide for approval by the District Court of any notice by the reorganization managers of termination of right to deposit securities for exchange under the plan, the decree of the District Court is affirmed at appellants' costs.