**HARRIS TRUST & SAVINGS BANK v. CHICAGO RYS. CO. et al.**

**FIRST NAT. BANK OF CHICAGO v. CHICAGO CITY RY. CO. et al.**

**Nos. 6839, 9915.**

District Court, N. D. Illinois, E. D.

Nov. 21, 1936.

See, also, In re Chicago Rys. Co., 17 F.Supp. 187.

Essington & McKibbin, of Chicago, Ill., for General Electric Co.

Wilson & McIlvaine, of Chicago, Ill., for First Nat. Bank of Chicago.

Gale Blocki, of Chicago. Ill., for Chicago City Ry. Co., Calumet & South Chi-

cago Ry. Co., and Southern Street Ry. Co.

Barnet Hodes, Corp. Counsel, of Chicago, Ill., for City of Chicago.

Burry, Johnstone, Peters & Dixon, of Chicago, Ill., for interveners Northern Trust Co. and Chicago City and Connecting Railways Collateral Trust Bondholders' Protective Committee.

Taylor, Miller, Busch, & Boyden, of Chicago, Ill., for Chicago Title & Trust Co.

Ulysses S. Schwartz, of Chicago, Ill., for interveners Chicago City Ry. Co. Bondholders' Protective Committee and Calumet & South Chicago Ry. Co. Bondholders' Protective Committee.

Poppenhusen, Johnston, Thompson & Raymond, of Chicago, Ill., for interveners Chicago City Ry. Co. Minority Stockholders' Protective Committee.

DeFrees, Buckingham, Jones & Hoffman, of Chicago, Ill., for interveners Chicago City and Connecting Railways Collateral Trust Preferred Participation Shareholders' Protective Committee.

Schuyler, Weinfeld & Hennessy, of Chicago, Ill., for intervener Halsey, Stuart & Co., Inc.

Denis E. Sullivan, of Chicago, Ill., pro se.

William H. Sexton, of Chicago, Ill., for Committee on Local Transportation.

Tenney, Harding, Sherman & Rogers, of Chicago, Ill., for Harris Trust & Sav. Bank and First Mortgage Bondholders' Committee.

Harold Smith and Sidney C. Murray, both of Chicago, Ill., for Westinghouse Elec. & Mfg. Co.

David O. Dunbar, Daniel J. Schuyler, and Edwin H. Cassels, all of Chicago, Ill., for Cont. Ill. Nat. Bank & Trust Co. of Chicago.

Pam & Hurd, of Chicago, Ill., for City Nat. Bank & Trust Co. of Chicago.

Mayer, Meyer, Austrian & Platt, of Chicago, Ill., for Consolidated Mortgage Series B Bondholders' Committee.

Townley, Campbell, Clark & Miller, of Chicago, Ill., for Purchase-Money Mortgage Bondholders' Committee.

Amos C. Miller, of Chicago, Ill., for depositors under agreement of August 1, 1907.

Pope & Ballard, of Chicago, Ill., for Protective Committee for Holders of Participation Certificates, Series 1.

John R. Guilliams, of Chicago, Ill., for Chicago Rys. Co.

Robert N. Holt, of Chicago, Ill., for Protective Committee for Holders of Participation Certificates, Series 2.

James M. Sheean and Weymouth Kirkland, both of Chicago, Ill., for receivers.

WILKERSON, District Judge.

Decrees of foreclosure and sale were entered in the above causes on May 11, 1931.

The decrees provided that those desiring to bid for the property should file with the special master a statement as to whether or not the bid was on behalf of a corporation organized with the intention that it should acquire the property pursuant to a plan of reorganization, and that, if the property was to be so acquired, a copy of the plan should be filed with the special master.

The decrees further provided that the special master should report to the court the bids received at the sale, and any reorganization plan submitted in connection therewith, and that at the hearing on the master's report the court should hear complaints from parties in interest as to the equity of the plan, and that no sale pursuant to a reorganization plan should be confirmed if the court should determine that the plan is inequitable and does not contain an equitable and timely offer of participation in the reorganization thereby proposed to all persons entitled thereto.

This court, by order of April 11, 1936, fixed May 29, 1936, for the date of the sale. On June 19, 1936, the special master filed his report showing that the only bids received by him were a bid of $19,000,000 for the property of the Chicago Railways Company, a bid of $11,000,000 for the property of Chicago City Railway Company, and a bid of $1,700,000 for the property of Chicago City and Connecting Railways Collateral Trust. The bids were submitted by M. H. MacLean and Frank M. Gordon, as joint tenants and not as tenants in common. There was submitted in connection with the bids a plan for the reorganization and unification of Chicago Railways Company, Chicago City Railway Company, Calumet & South Chicago Railway Company, the Southern Street Railway Company, and Chicago Western Railway Company. The plan provides for the organization of a new company to be known as Chicago Surface Lines, Inc., and

for the exchange of bonds and stock of the new company for bonds and stock of the old companies on the basis stated in the plan. ·The plan is clearly and concisely drafted, and no attempt will be made to summarize it here. Such an attempt might involve inaccuracy in order to obtain brevity. The plan states the facts relative to the committees which participated in framing it, the capitalization of the existing companies, the organization of the new company, the distribution of the securities of the new company, and the method of participation in the plan. The plan comes before the court with the support of a very. large majority of the bondholders of the old companies. More than two-thirds of each group of bondholders have approved the plan, and out of a total bonded indebtedness of $152,-900,296.66 bonds to the amount of $130,-451,800.00, or 85.31 per cent., have been deposited with the committees supporting the plan.[1]

The stockholders of the Chicago Railways Company do not support the plan. Of the 8,999 shares of so-called minority stock of the Chicago City Railway Company 64.56 per cent. of the stockholders favor the plan and 79.8 per cent. of the 250,000 shares of the Chicago City and Connecting Railways Collateral Trust Preferred Participation Shares favor the plan.

Objections have been filed by the holders of bonds in the following amounts par value: Chicago Railways Company Firsts $47,000; Chicago Railways Company A.'s $677,000; Chicago Railways Company B.'s $199,000; Chicago Railways Company Adjustments $25,000; Chicago City Railway Company Firsts $46,000; Chicago City and Connecting 5's $67,000. Objections were also filed on behalf of Fred Bright et al., holding all kinds of securities of both north and south side lines having a par value of $2,300,000. The Bright objections go to the points that income bonds should be used in place of preferred stock of the new company; that there should be a variable rather than a cumulative sinking fund; that the interest rate on the first mortgage bonds of the new company should be less than five per cent.; and that the voting trust provisions should be eliminated. In the brief filed in support of the Bright objections it is stated that this group is in accord with the general tenor of the plan and feel that a reorganization is so urgent that only constructive criticism and recommendations should be given in objecting to the plan. There are other objections by the depositaries of the stock of the Chicago Railways Company, a committee of holders of series 1 certificates of Chicago Railways Company, a committee of holders of series 2 certificates of Chicago Railways Company, the Chicago Title & Trust Company, as trustee of Chicago City and Connecting Collateral Trust, and committees of bondholders and shareholders under that trust.

The objections must be considered in the light of the history of this litigation. and of the practical situation which confronts both the litigants and the court. This proceeding has reached the stage at

---

[1] The following table shows the amounts of securities outstanding and the amounts deposited on June 2, 1932.

| Name of Security | Amount Outstanding | Deposited June 2, 1936 Amount | Per Cent |
|---|---|---|---|
| Chicago Railways Company | | | |
| First Mortgage 5s | $55,655,000.00 | $47,207,000.00 | 84.82% |
| Series A Consolidated Mortgage 5s | 15,696,600.00 | 13,029,000.00 | 83 |
| Series B Consolidated Mortgage 5s | 16,934,405.00 | 13,719,000.00 | 81.01 |
| Purchase Money Mortgage 5s | 3,969,155.00 | 2,717,500.00 | 68.96 |
| Adjustment Income 4s | 2,379,136.66 | 2,055,300.00 | 86.383 |
| Total (Chicago Railways Company) | $94,634,296.66 | $78,727,800.00 | 83.19 |
| South Side Lines | | | |
| Bonds: | | | |
| Chicago City Railway Company First Mortgage 5s | $32,523,000.00 | $29,912,000.00 | 91.97 |
| Calumet and South Chicago Railway Company First Mortgage 5s | 5,127,000.00 | 3,824,000.00 | 74.58 |
| Chicago City and Connecting Railways Collateral Trust Sinking Fund 5s | 20,616,000.00 | 17,988,000.00 | 87.252 |
| Total Bonds (South Side Lines) | $58,266,000.00 | $51,724,000.00 | 88.77 |

which some method must be devised 'by which these receiverships will be brought to a close. Almost ten years ago a creditor's bill was brought against the Chicago Railways Company and receivers were appointed. On February 2, 1927, a foreclosure suit was commenced against that company and the receivership extended. The franchises under which the constituent companies of the Chicago Surface Lines were operated expired on February 1, 1927, and have been extended from time to time since that date. When application was made to the city for a new ordinance, the companies were informed by the city that such an ordinance must embrace in one system the properties not only of the street car companies but also those of the company operating the elevated roads. To accomplish this, it was necessary that amendatory legislation should be enacted. On December 6, 1928, the court named a committee, of which James Simpson was chairman, to co-operate with the city and the companies in drafting a new traction ordinance and enabling legislation. The city council passed a resolution indorsing the action of the court.

The necessary enabling legislation was passed and the city council of Chicago passed the 1930 ordinance authorizing the Chicago Local Transportation Company, as grantee, to acquire and operate the properties of the street car and elevated companies. The ordinance was submitted to referendum and adopted by a vote of six to one. In July, 1930, the properties of the south side lines were brought into receivership in this court in foreclosure suits. A reorganization plan was worked out on the basis of the 1930 ordinance and was declared operative on April 1, 1931. That plan was submitted to security holders and approved by a great majority. There was litigation involving the validity of the enabling legislation and the 1930 ordinance. In July, 1932, the Supreme Court of Illinois upheld the validity of the legislation and the ordinance. Bass v. City of Chicago, 349 Ill. 304, 182 N.E. 419. In the meantime receivers had been appointed for the Chicago Rapid Transit Company, and the financial situation resulting from the panic of 1929 made it impossible to carry out the 1931 reorganization plan. The court then appointed the late Walter L. Fisher special counsel for the purpose of bringing the parties together in an agreement upon an amended plan. This task was a difficult one, and

on March 21, 1934, Mr. Fisher reported to the court that the committees representing the various groups of security holders had agreed upon amendments to the plan. On the same date the mayor of the city of Chicago recommended to the city council that it should not extend the time within which the Chicago Local Transportation Company could accept the 1930 ordinance. The city council did not extend the time of acceptance. The 1930 ordinance, therefore, lapsed, and the plan of reorganization under it failed.

The representatives of the surface lines committees then stated to the court that the city would not consider further applications for a new ordinance until the street car companies were reorganized, the receivership terminated, and the properties turned over to a new company. Thereupon the court appointed W. Rufus Abbott, M. H. MacLean, Frank M. Gordon, Bernard E. Sunny, and John E. Blount as a committee to prepare a plan for the reorganization and unification of the surface lines. The plan was completed and presented to the court on October 31, 1935. Pursuant to orders of court, it was submitted to all holders of the securities of the street car company. The plan met with the approval of a great majority of the security holders. The bondholders' committees gave final approval to the plan, and the court, on April 11, 1936, entered the orders fixing the date of sale under the decrees of May 11, 1931.

The special master filed his report on June 19, 1936, and the court heard objections to the report and the plan during July, 1936. At the conclusion of the hearing on the plan, the defendant the City of Chicago asked and was given leave to file within fifteen days a statement. That statement was filed. In the statement the city disclaimed any interest in the distribution of the securities to be issued by the new company. The city made objection to certain provisions of the plan, and pointed out that, in its opinion, it would be impossible for the new company, in view of its financial structure under the plan, to provide the extensions and improvements necessary to the adequate performance by the new company of its duty as a public utility. The statement concluded with the request that the court "defer action on the proposed reorganization of the companies until the requirements for additional local transportation

facilities in the City of Chicago are more definitely known, and until the amount of new capital which will be needed to modernize the traction properties has been definitely determined." It will be seen, therefore, that the representatives of the security holders misunderstood the position of the city when application was made for the reorganization of the properties independently of the application for a new ordinance.

Briefs have been filed by the proponents of the plan and the objectors, and the proponents of the plan have filed suggestions relative to the city's statement.

■ Objections based upon the alleged inadequacy of the bids cannot be sustained. Practically, it is impossible to sell the property of a large public utility like this for cash. The interests of all parties, including the public, are best served by cooperation between security holders. These bids were made as a step in reorganization. They must be .considered in the light of a plan which is supported by 85 per cent. of the security holders. Kansas City Railway Co. v. Central Union Trust Co., 271 U.S. 445, 455, 46 S.Ct. 549, 551, 70 L.Ed. 1028; Warner Bros. Pictures v. Lawton-Byrne-Bruner Ins. A. Co. (C.C.A.) 79 F.(2d) 804, 811, 817; Thomas v. Central Hanover Bank & Trust Co., 64 App.D.C. 96, 75 F.(2d) 227; Temmer v. Denver Tramway Co. (C.C.A.) 18 F.(2d) 226, 228. The first mortgage indebtedness on these properties is more than $72,000,000. Holders of first mortgage bonds in the amount of less than $100,000 have objected to the plan on this ground. It would require a bid in excess of $72,000,000 for both properties to produce anything for distribution among junior security holders. The assertion that the amount of the bid will have some effect upon the negotiations for a franchise imputes to those with whom the companies will have to deal in obtaining a new ordinance ignorance of the elementary principles of rate making for public utilities. The bid at a sale in connection with reorganization is no more a test of value for franchise or rate-making purposes than is the assessed value placed on the property for levying taxes.

■ Some of the objections are aimed at the structure of the new company and the provisions of the voting trust agreement. It is urged that income· bonds should be issued instead of preferred stock; that the sinking fund should be variable and not cumulative; that the interest on the first mortgage bonds is too high; and that the voting trust agreement should be eliminated or radically modified. The court should not undertake to set aside the business judgment of a large majority of the security holders because of some notion of its own, unless it is clear that the provisions relating to the new company are inequitable and unfair. It cannot be said with certainty that the amendments proposed by a small minority will work out in practice any better than the provisions approved by the large majority. The court does not possess dictatorial power in this respect, and should not reject the proposals of large majori- ties merely because of views which it might entertain on financial or economic questions or because of a prophecy which it might be inclined to make as to the trend of business.

There are some matters relating to the voting trust agreement which may require further consideration when the negotiations for a new franchise are completed. These will receive further consideration when all of the facts relating to the conditions under which the new company will operate are definitely before the court.

■ The objections to the distribution of securities of the new company are best answered by the substantial unanimity of both junior and senior security holders in support of the plan. It would require more than has been shown here, or even suggested, to overcome the verdict of the bondholders themselves that all classes have been treated fairly. The distribution of securities proposed under the plan does not violate the principles stated in Northern Pacific Ry. Co. v. Boyd, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931; Kansas City Railway Co. v. Central Union Trust Co. of New York, 271 U.S. 445, 46 S.Ct. 549, 70 L.Ed. 1028; Jameson v. Guaranty Trust Co. of New York (C.C.A.) 20 F. (2d) 808.

The objections of the depositaries of the stock of the Chicago Railways Company and of the certificate holders of that company must be disposed of in accordance with the adjudication of their rights in the state and federal courts. Babcock v. Chicago Railways Co., 325 Ill. 16, 155 N.E. 773; Id., 236 Ill.App. 360; Harris Trust & Savings Bank v. Chicago Railways Co.

et al. (C.C.A.) 56 F.(2d) 942; City of Chicago v. Harris Trust & Savings Bank (C.C.A.) 40 F.(2d) 612; Harris Trust & Savings Bank v. Chicago Railways Co. et al. (D.C.) 39 F.(2d) 958; In re Babcock (C.C.A.) 26 F.(2d) 153; Babcock v. Wilkerson, 278 U.S. 615, 49 S.Ct. 20, 73 L.Ed. 539; Harris Trust & Savings Bank v. Chicago Railways Co. et al. (D.C.) 23 F.(2d) 192; Thatcher v. Chicago Railways Co. (C.C.A.) 4 F.(2d) 63; Id. (D.C.) 297 F. 466.

Considering the financial condition and earnings of the Chicago Railways Company and the probable earnings of the new company, it cannot be said that the owners of the stock of the Chicago Railways Company have been dealt with unfairly under the plan. It must be remembered that there is a decree of foreclosure in this case; that the bondholders are entitled to have that decree executed some time; and that a secured indebtedness in the amount of $95,000,000 stands ahead of any right of the certificate holders to participate in the proceeds of the sale.

Nor have the shareholders in Chicago City and Connecting Railways Trust been treated unfairly. There is a secured indebtedness of more than $58,000,000 ahead of those shareholders. The secured creditors are entitled to protection of the rights established by the decrees of foreclosure.

The objections to the report of sale and to the plan will be overruled. The approval, however, is tentative and interlocutory and not final.

The plan provides for the transfer of title to the properties offered at the master's sale to a new company. That company must obtain from the Illinois Commerce Commission authorization to issue the securities required to carry out the plan. The court is not inclined, however, without further consideration and without further showing of the necessity for so doing, to approve an exchange of the issues of stocks and bonds of the old companies for those of a company to which the city has refused a new grant. Such a grant should be obtained, if it is possible to do so, on terms which are not confiscatory and which are fair to both the public and these utilities. The court withholds judgment upon the consummation of a plan under which the new company has no rights in the streets save those which arise from section 23 of the ordinance of 1907.

The city, which is a party to these proceedings, requests the court to defer final action on the plan until the terms of the new ordinance have been considered. The court is of the opinion that this request should be granted and that final action on the plan should be postponed for a reasonable time in order that its proponents may apply for an ordinance and the terms upon which it will be granted may be ascertained.

The proponents of the plan should make prompt application for a new ordinance. The receivers and their attorneys should cooperate in trying to obtain a settlement and in bringing this receivership to an end. If an ordinance is obtained without material modification of the plan, application may be made for a final order of confirmation. If it is found that the plan should be modified, that fact should be reported to the court and the proposed amendments presented. If a new grant cannot be obtained, that fact should be reported and application may then be made for the approval of the plan on the basis of the rights under the 1907 ordinance.

The proponents of the plan should file a report with recommendations on or before January 25, 1937, and the cause will be continued for further hearing on that report on February 1, 1937.

The foregoing are the court's findings and conclusions on the objections to the special master's report of sale and the reorganization plan submitted therewith.