**CITY OF CHICAGO v. HARRIS TRUST &
SAV. BANK et al.**

No. 4141.

Circuit Court of Appeals, Seventh Circuit.
April 30, 1930.

Albert H. Veeder and Edward Higgins, both of Chicago, Ill., for appellant.

Horace Kent Tenney, of Chicago, Ill., for appellees.

Before EVANS, PAGE, and SPARKS, Circuit Judges.

PAGE, Circuit Judge.

In the receivership of the Chicago Railways Company in the United States District Court, wherein mortgages are being foreclosed, the court, on July 18, 1928, entered a decree fixing the amounts and priorities of the liens. In that decree, it was found that the first mortgage was a lien, upon all of the property of the company, prior to that of any of the defendants, except the Westinghouse Company.

The city of Chicago, the sole appellant, is here contending that it has the first and prior right to certain special funds (two of them created under the provisions of the ordinance under which the Railways Company operated), viz., (1) a renewals and depreciation fund, amounting to over $10,000,000; (2) a Damage Reserve Fund of about $500,000; and (3) a fund, called in the decree a special renewal and equipment fund, of about $200,000, created by order of the Public Utilities Commission of Illinois, entered July 31, 1920.

Prior to 1907, the street railway lines, known as the Union Traction System, were under receivership in the United States Court. A reorganization plan was effected, under direction of the court, by agreement of substantially all of the interests. As a part of the reorganization plan, the Chicago Railways Company, here in receivership, was incorporated and took over the properties then in receivership and has operated them during the 20-year term of the ordinance, enacted by the city of Chicago on February 11, 1907, as a part of the reorganization plan.

At the time of the reorganization, the physical condition of the properties was very bad, and there were many secured and unsecured creditors and stockholders, whose interests had to be considered, reconciled and secured or otherwise disposed of. As a part of the reorganization plan, the city passed an ordinance, requiring the expenditure of a very large sum of money for immediate rehabilitation of all the properties, and provided in great detail for the rehabilitation, maintenance, management, and operation of the system. As there was little money, the business and financial structure, required in and set up under the ordinance for the protection of the various interests, including the public, and for the rehabilitation and operation of the properties, consisted of: (1) The corporation now in receivership, with a capital stock of $100,000; (2) a first mortgage, securing bonds, to be sold to procure money for the rehabilitation requirements. The plan also provided for subsequent mortgages and participation certificates, to secure the bonds, stocks, etc., theretofore issued by and then outstanding against the Union Traction Company and its underlying companies. The ordinance also made provision for the first two of the special funds, above referred to, the disposition of which by the decree is here brought in question by the city.

The city makes three claims to the special funds: (1) That it is entitled to 55 per cent. of them under the ordinance; (2) that it or its licensee is entitled to them in case a purchase is made by either under the ordinance; (3) that the city is the custodian of those funds for the public. The claim that the terms of the first mortgage do not cover the special funds will be later considered.

In the light of these claims, it is important to consider the origin, purpose, and the ordinance requirements for the ultimate disposition of the special funds in question.

The renewals and depreciation fund had its origin in section 16 of the ordinance, wherein it is provided: "The Company shall deposit with one or more of the said depositaries in a separate fund, appropriately designated, a sum equal to 8 per cent. of the gross receipts of said street railways and property for the preceding month. * * * "

A part of the renewals and depreciation fund may also have had its origin under the terms of section 9 of the ordinance, providing that, after the period of immediate rehabilitation, property unnecessary and unadapted to the proper operation and maintenance of the system might be sold, and in case of sale the proceeds should be added to and become a part of the renewals and depreciation fund.

The damage reserve fund had its origin in section 18 of the ordinance. After providing for the payment out of gross assets, as an operating expense, for all damages growing out of injuries to persons and property it further provided that "the Company may [1] set aside, as a separate fund, such percentage of said gross receipts as the said Board of Supervising Engineers shall estimate to be sufficient to protect the Company against all such claims."

The purpose, as stated in section 16, for which the renewals and depreciation fund was established, is "for taking care of Renewals and Depreciation of said street railways and property," to be paid out as au-

---

[1] In the consolidated operating agreement of 1913, the word "may" is made to read "shall."

thorized by the board of supervising engineers.

The purpose of the damage reserve fund, as stated in section 18, is "to protect the Company against all such claims, to the end that if the said City, or its licensee, shall elect to purchase the street railway property of the Company, as provided by this ordinance, there shall be then available to the Company a fund sufficient to meet and discharge all legitimate claims for such damages."

Other than the reasons and purposes above stated, we do not find any reason why or purpose for which the above special funds were, or either of them was, established. We do not find any provision or apparent intent that the special funds should at any time cease to be the property of the company during the operation of the street railways, nor do we find that the company's liability for any of the purposes for which the funds were established ended with the establishment of those funds.

Other than the disposition of the funds in the manner and for the purposes for which they were established, as stated in the ordinance, there is no provision for the disposition of the renewals and depreciation fund during the operation of the railways by the company. There is, as to the damage reserve fund, however, a provision in section 18, that will be considered in connection with the city's claim to 55 per cent. of that fund.

The special renewal and equipment fund had its origin in an order of the Public Utilities Commission of Illinois. The 8 per cent. of the gross assets, out of which the renewals and depreciation fund was created under section 16 of the ordinance is the same 8 per cent. out of which this special renewal and equipment fund was created. The order provides: "In lieu of depositing said sum, from month to month, in said Renewal and Depreciation Fund, as heretofore provided, said petitioners are hereby ordered to expend said sum, less actual expenditures for current renewals, in the purchase of additional equipment. Said eight per cent. of said gross receipts shall be deposited from month to month in special accounts, called Special Equipment Fund, or otherwise appropriately designated."

We are of opinion that, so far as here involved, this third fund should be treated exactly as though any unexpended portion of it was a part of the renewals and depreciation fund under section 16.

Section 20 gives the city the right to purchase the street car system at any time upon the terms and conditions therein specified. Section 22 provides that, instead of its purchase, the city may designate a licensee that shall have the right to purchase the street railway system at any time and in the same manner at and upon which the city has the right to purchase, subject to the condition that the said licensee shall purchase the same property which the city has the right to purchase.

So far as this record shows, there has been no election on the part of the city to purchase, nor any indication on its part of any intention to purchase or to designate a licensee to have such right under the ordinance; and it is not necessary here to determine whether any one has or has not now the right to purchase under the terms of the ordinance. We will, however, consider the provisions of the ordinance under which the special funds in question are to be disposed of in case of a purchase by the city or its licensee.

Section 16 provides, with reference to the renewals and depreciation fund: "In the event that the said street railway system shall be purchased by the said City, or its licensee * * * the amount then on deposit in each of said reserve funds, or due to be deposited therein at the time of such purchase, shall be turned over to and become the property of the said City or of its said licensee."

Two reserve funds are mentioned in section 16, but one of them is not in question here.

Section 20, in describing the property which is to pass to the city in case of purchase, includes, among other things: "And the sums then on deposit as a reserve fund under the provisions of Section 16 of this ordinance."

■ With the exception of some provisions in the ordinance that relate to taking over the property by the city during the 20-year term of the ordinance, the above provisions are the only ones that give the city any right to the renewals and depreciation fund in case of purchase. We are of opinion that if it has the right to purchase under the ordinance, it is not now in a position to dictate or complain of the disposition of that fund, as provided for in the decree, because it has not yet elected to do so, nor has it given the notice required by the ordinance. Neither has it designated a licensee who may purchase.

■■ With reference to the damage reserve fund, section 18 provides that in case of purchase, or in case the company shall become bound to deliver possession of the system to

the city of Chicago or its licensee, "the Company shall deposit with one or more of the depositaries herein authorized the fund then accumulated under the provisions of this Section, together with such of the 'net receipts' of the Company from the operation of its street railways as shall not have been divided between the Company and the City prior to the giving of the notice by the City or its licensee of its intention to purchase * * * and the Company shall assume and pay and save the said City or such licensee harmless from all such claims for damages, payment for the same to be made out of the fund so deposited upon the order of the Company countersigned by the said Board of Supervising Engineers."

We find no provision for the delivery of that fund to the city, and, except as hereinafter considered in connection with the 55 per cent. of the net income to be paid to the city the city has no right to, or control over, any part of the damage reserve fund.

Section 25 provides that from the gross receipts of the company there shall be deducted: (1) All expenses of operation, including maintenance, repairs, and renewals; (2) all amounts contributed during said year and then held in reserve under the provisions of sections 16 and 18; (3) all amounts paid for taxes, etc.; and (4) all salaries and expenses of the board of supervising engineers authorized by the ordinance. It is also provided: "After the deduction from the gross receipts of the items hereinbefore in this Section provided, the amount remaining shall be considered as the net receipts for such year arising from the operation of the street railway system hereby authorized, and shall be divided between the Company and the City in the following proportions: forty-five (45) per cent to be retained by the Company and fifty-five (55) per cent to be paid forthwith by the Company to the said City, crediting thereon all amounts paid out during the preceding year by the Company for license fees, if any, exacted from the Company or its employees."

By section 16 it is provided that the renewals and depreciation fund "shall be considered a part of the operating expenses of the street railway system," so that in arriving at the "net receipts," as specified in section 25, the funds provided for in sections 16 and 18 are to be deducted, and do not therefore form any part of the net receipts of which the city has the right to receive 55 per cent. under the general provisions therefor in section 25.

But with reference to the damage reserve fund, it is specifically provided in section 18, first, that, "in case the balance of said fund at any time remaining shall be, in the judgment of the Board of Supervising Engineers, more than sufficient to protect the Company against all then unsettled claims, the Company shall pay to the said City fifty-five (55) per cent of the estimated excess, and the Company at the same time shall be entitled to apply to its own use and benefit forty-five (45) per cent of such estimated excess."

Second, it is stated, in connection with the provision in that section relating to a purchase, that if the fund so retained and deposited shall be more than sufficient to pay and discharge any such claims in full, then the said depositary or depositaries shall pay to the said city, or its licensee, as the case may be, 55 per cent. of such excess, and to the company 45 per cent. of such excess.

We are of opinion that in so far as the damage reserve fund is concerned, the city is entitled to 55 per cent. of what remains after payment of the claims, for the liquidation of which the fund was established, but we are also of opinion that the city has no other right in, or control over, that fund.

When it is remembered that under the terms of the ordinance, the city's licensee, if it purchases, will take all that the city has the right to take in case the city purchases, the plea that the city takes the special funds for the public seems to be without merit.

Although the city's right to the 55 per cent. of any excess in the damage reserve fund may be absolute, if it appears that there is such an excess, yet the city has made no attempt or offer to show that there is or will be such an excess, and it is therefore not in a position to complain of the disposition of that fund on the theory that there is an excess over the amount necessary to pay damages. The city is not therefore in a position to complain of any disposition of the special funds for any proper corporate purpose. We are not passing on any question that may arise if and when it does put itself or a licensee in a position to purchase.

It seems clear to us that the terms of the mortgage, which are as broad as such instruments can well be drawn, cover the funds in question. Section 2 of the ordinance reads: "The expressions 'property of the Company' or 'street railway system of the Company' or equivalent expressions as hereinafter used, except where the context clearly indicates a different meaning, shall be deemed to denote all the property from time to time possessed

or used by the Company in and about the street railway business conducted under the provisions of this ordinance, including all franchises, rights and privileges of every nature enjoyed or exercised in connection therewith, irrespective of the nature or extent of the Company's interest therein, and a similar construction shall be given to expressions relating to particular classes or species of the Company's property."

Section 7 provides for the rehabilitation of the property and the means of securing the money to be raised therefor. The securing instrument there provided for is the first mortgage in question. In section 20, it is stated: "As against the City and any licensee of the City and any and all other persons having or claiming to have any interest or benefit under this ordinance, the lien securing said bonds and obligations" (first mortgage) "shall at all times be deemed and recognized to be a first lien upon the entire street railway system hereby authorized, including all rights granted to the Company by this ordinance."

The ordinance provides that the trust company, qualified to act as a depositary under the ordinance and selected by the mayor of the city of Chicago, was to approve, and it did approve, the terms of the mortgage as containing "no provision unusual or unreasonable in character."

Under the granting and pledging clause of the mortgage, the property conveyed and described is, in part:

"The following described property, real, personal and mixed, and the following described rights, titles and interests, legal or equitable, howsoever created and in whatsoever manner evidenced, to-wit:

* * * * , * *

"Seventh.—All the right, title and interest which the Railways Company now has or may at any time hereafter acquire or become entitled to, have, in and to each and every the funds, properties, deposits, amounts, obligations and claims mentioned in the Ordinance, including (without, by this enumeration, in any wise limiting the force and generality of the foregoing language, or thereby excluding any right, benefit, advantage, property, deposit, fund, amount, obligation, or claim, present or future, accrued or to accrue, of the Railways Company under the Ordinance, or otherwise in the premises), to-wit:

* * * * * *

"(f) Any and all right and interest which the Railways Company may at any time have, or be entitled to have, to or in the sums and funds mentioned, respectively, in Sections 18, 21, 25, 29, 32, 34 and 38 of the Ordinance, or under any other provision thereof, whether the same, or any part thereof, shall become payable by the City of Chicago, or by any licensee of the said City, or by any nominee or grantee of said City, or by any other person, firm, or corporation, or under or by virtue of any judicial proceeding, or otherwise."

The city urges that because section 16 is not mentioned in section 7(f), above, it was not the intention to cover it by the mortgage. (7)f does mention section 25, and that section specifically refers to funds reserved under both sections 16 and 18.

The decree states: "This decree is entered without prejudice at this time of any right of the City of Chicago to purchase the property of the Chicago Railways Company or to grant a license to another company to purchase the same, and in case such purchase or any offer of such purchase is made the court reserves jurisdiction to determine all questions relating to the acceptance of such offer with reference to the payment of the purchase money and the distribution thereof among the parties entitled thereto."

We are of opinion that if the city of Chicago should ever bring itself or its licensee into a position where it or the licensee will have the right, under the ordinance, to purchase the property, that the above reservations in the decree are sufficient to enable the court to fully protect the city and its licensee in respect to all rights that either may have under the ordinance. If the funds in question are actually paid to the first mortgagee, they will be far from sufficient to discharge the mortgage, and the mortgagee would necessarily have recourse, in case of purchase, to the purchase price for the satisfaction of the mortgage. The court could, in the event of purchase, that must necessarily be carried out under the direction of the court, adjust all equities between the parties. If it shall appear that there is any equity in the damage reserve fund belonging to the city, that likewise is a matter that can be adjusted if and when such equity is ascertained.

We are of opinion that the decree should be, and it is, affirmed.