## HARRIS TRUST & SAVINGS BANK v. CHICAGO RYS. CO., and three other cases.

### Nos. 4543–4545.

Circuit Court of Appeals, Seventh Circuit.
March 14, 1932.

GEIGER, District Judge, dissenting.

See, also, 23 F.(2d) 192; 39 F.(2d) 958.

Henry S. Robbins, of Chicago, Ill., for appellants Babcock and others.

Herbert Pope, of Chicago, Ill., for appellants Tyler and others.

Amos C. Miller, of Chicago, Ill., for appellants Riley and others.

Horace Kent Tenney and Henry F. Tenney, both of Chicago, Ill., for Harris Trust & Savings Bank, trustee.

David O. Dunbar, of Chicago, Ill., for Continental Illinois Bank & Trust Co., trustee under the consolidated mortgage.

Edwin H. Cassels, of Chicago, Ill., for continental Illinois Bank & Trust Co., trustee under the purchase-money mortgage.

Harold Smith, of New York City, and Sidney C. Murray, of Chicago, Ill., for Westinghouse Electric & Mfg. Co.

Percy B. Eckhart and Roy O. West, both of Chicago, Ill., for H. A. Blair and B. A. Eckhart.

Charles S. Babcock, of Chicago, Ill., for Chicago Rys. Co.

James M. Sheean and Weymouth Kirkland, both of Chicago, Ill., for H. A. Blair and F. H. Rawson, as receivers of Chicago Rys. Co.

Harry Boyd Hurd and Andrew J. Dallstream, both of Chicago, Ill., for Central Trust Co. of Illinois, as trustee.

Francis X. Busch and Martin H. Foss, both of Chicago, Ill., for City of Chicago.

Before EVANS and SPARKS, Circuit Judges, and GEIGER, District Judge.

EVANS, Circuit Judge.

The three appeals, which were consolidated by order of the court, present identical questions. As holders of Certificates Series One, appellants, individually and for others similarly situated, intervened in the pending suit, which was brought to liquidate the property of the Chicago Railways Company. The original suit was instituted by a creditor. Following closely was a foreclosure suit begun by a trustee of one of the outstanding mortgages executed by said railways company. Receivers were appointed, the two suits were consolidated, and the status of the various securities was fixed. The contest has narrowed to one between the certificate holders and the bondholders, and is restricted to the net earnings of the railways company subsequent to 1917.

The trial court made complete and detailed findings of fact which are not assailed. The appeals challenge the soundness of the conclusions of law, which the trial court made, and which were dependent for their support upon certain documents executed on the occasion of the reorganization of the street railway system in 1907, the details of which have been so fully stated in cases which have arisen [In re Babcock (C. C. A.) 26 F. (2d) 153; Thatcher v. Chicago Railways Co. (D. C.) 297 F. 466; Id. (C. C. A.) 4 F.(2d) 63; Babcock v. Chicago Railways Co., 325 Ill. 16, 155 N. E. 773; City of Chicago v. Harris Trust & Savings Bank (C. C. A.) 40 F.(2d) 612] that reference is made to these cases to avoid extended repetition of the essential facts. The situation which existed in 1907, when the companies were in receivership and the franchises had expired, may in part be gathered from a reading of Guaranty Trust Co. of N. Y. v. North Chicago St. R. Co. (C. C. A.) 130 F. 801; Blair v. City of Chicago, 201 U. S. 400, 26 S. Ct. 427, 50 L. Ed. 801; North Chicago St. R. Co. v. Chicago Union Traction Co. (C. C.) 150 F. 612;

Guaranty Trust Co. of N. Y. v. Chicago Union Traction Co. (C. C.) 158 F. 913; Id. (C. C. A.) 158 F. 923.

It is perhaps sufficient to say that the plan entered into by the stockholders of the different street railway companies then operating in Chicago, bondholders of such companies, and the city of Chicago, approved by Judge Grosscup and Professor Gray, and the agreements, supply the sole basis for determining the status and the rights of the parties to this present controversy. In the reorganization, which followed the plan approved by the said city of Chicago, the creditors, and the railways company, provisions were made for the execution of mortgages, the payment of a percentage of the company's net earnings to the city, and the issuance of stock, interests in which were evidenced by participating certificates classified into series 1, 2, 3, and 4. The status of these classes of certificates was specifically defined and provision made for the control of the management of the company through an election by the certificate holders. For some ten years after the plan went into effect, net earnings were distributed to the certificate holders. After 1917, such earnings were not distributed. It is to establish the contested right of these certificate holders to these net earnings of the company since 1917 that the present legal battle is waged.

Set forth below are excerpts taken from the ordinance, agreements, the certificates, and the mortgages, executed pursuant to the plan:

Chicago Railways Company Ordinance (1907):

"Section 2. The Company shall proceed at once to reconstruct portions of the track and roadbed constituting said system of street railways now maintained and operated by the Receivers * * * and put said entire street railway system, plant and equipment in first-class condition, in full compliance with * * * this ordinance and * * * 'Exhibit B,' * * * and to operate and maintain said system in accordance with the provisions of this ordinance and of said 'Exhibit B.' * * * "

"Section 7. * * * The cost of such construction, * * * not exceeding the amount so certified, * * * may be represented by bonds or obligations to be held, negotiated or sold by the Company, bearing interest at a rate not exceeding five per cent per annum, payable semiannually, * * * maturing not earlier than twenty years after

the passage of this ordinance * * *. Such bonds * * * may be secured by a mortgage or deed of trust, which shall comply with all the provisions of this ordinance and the form of which shall be * * * subject to the approval of a Trust Company qualified to act as depositary under the terms of this ordinance, * * * as containing * * * *no provision unusual or unreasonable in character*. The Company shall not at any time create any lien or encumbrance upon the property or rights conveyed by said mortgage or deed of trust or any part thereof superior to that securing said bonds and obligations."

"Section 20. * * * As against the City and any licensee of the City and any and all other persons having or claiming to have any interest or benefit under this ordinance, the *lien securing said bonds and obligations shall at all times be deemed and recognized to be a first lien upon the entire street railway system hereby authorized, including all rights granted to the Company by this ordinance. * * * *"

Agreement of Reorganization and Adjustment:

"The Committee shall have full power, subject to the control of the Board of Directors of the Railways Company: * * * (d) To prescribe the form and terms of the new securities to be issued by the Railways Company; * * *

"(i) To construe this Agreement including the Plan. Any such construction by the Committee or any action under any such construction made or taken in good faith shall be final and conclusive. Also to supply any defect or omission of or in the Plan or to reconcile inconsistencies in it in such manner and to such extent as shall be necessary or expedient to carry out the same properly and effectively. * * *

"The acceptance by any Depositor of the securities of the Railways Company shall estop such Depositor from questioning the conformity of said securities, in any particular, to the Plan or this Agreement, or the propriety or expediency of any act done or arrangement made by or on behalf of the Committee, or the Railways Company, in carrying the Plan into effect."

Modified Plan of Reorganization and Adjustment (Excerpts from Article III):

"5. The said Consolidated Mortgage shall provide for a Sinking Fund of $250,000 per annum, if earned, commencing with the year ending August 1, 1908, which sum shall be applied, annually, solely to the redemption at par, or to the purchase of bonds of said Series C; and all such bonds thus redeemed or purchased shall be canceled. Said Sinking Fund shall be cumulative. * * * *When the full amount of said Sinking Fund payment shall have been made in any year and any accumulated deficiencies in respect of said payment shall have been met, any remainder of such earnings SHALL be applied, next, to the payment of $8 for such year, and of any unpaid accumulation for preceding years, in respect of each equal part represented by Participation Certificates of Series 1.* Next, so long as more than 50 per cent., par value, of said Bonds of Series C which may be issued by the Railways Company, are outstanding, the sum of $497,022.16 per annum, if earned, and, when not more than 50 per cent. of said Bonds are outstanding, the sum of $621,277.70, * * * if earned, shall be distributed pro rata for the benefit of the holders of then outstanding Participation Certificates of said Series 2. The respective sums of $497,022.16 and $621,277.70, per annum, above provided in respect of said Participation Certificates of Series 2, shall be non-cumulative. After payment in any year of said $497,022.16, or of said $621,277.70 (as the case may be), for distribution to the holders of said Participation Certificates Series 2, then any remaining surplus earnings shall be used and applied solely as follows: Unless the Board of Directors, with the consent in writing of a majority of the then acting Trustees and Depositaries or of the sole Trustee or Depositary under said Participation Certificate Agreement, shall resolve to apply the same to meet the exigencies and financial requirements of the Railways Company, the said remaining annual surplus earnings shall constitute an additional annual Sinking Fund to be applied in such year to the redemption at par or purchase and cancellation of Bonds of said Series C until the entire issue thereof shall be discharged; and thereafter, if any of the same shall have been issued as above provided, to the redemption at par, or purchase, of the above specified number of Bonds of Series A and Series B. When all of said Bonds of Series C and * * * Series A and Series B * * * shall have been redeemed, * * * and when all unpaid accumulations on Series 1 have been paid, then any unpaid accumulations in respect of said $8 per equal part represented by said Participation Certificates Series 2, for each year then past, commencing with the year ending;

August 1, 1908; shall be payable out of the earnings of future years."

"4. The stockholders of the Railways Company will make the capital stock of the Railways Company, viz. ........................$100,000 the subject of an issue of Participation Certificates, of which there shall be issued certificates representing in the aggregate ................... 265,100 equal parts as follows:

"(a) Series 1, entitled to priority in the distribution of dividends upon the said capital stock or of any dividends or income on or by reason of any other securities which may at any time become subject to the Agreement under which said Participation Certificates are issued, to the extent of $8 for each part represented by said certificates respectively, for each and every year commencing with the year ending August 1, 1908, accumulative until paid."

Deposit Agreement under which Participation Certificates were Issued:

"Whereas, it is provided in the Plan that Participation Certificates entitling the holder thereof to the share and interest therein and herein specified, of, in and to the capital stock of the Railways Company and the dividends which may be declared and paid thereon, * * * shall be issued, on the terms and conditions in the Plan set forth. * * *

"Subject to the provisions of this Agreement, the total interest in the capital * * * stock of the Chicago Railways Company, * * * and in the dividends or income from time to time to be paid thereon, shall be divided into Two hundred and sixty-five thousand one hundred (265,100) equal parts * * *.

"It is provided in the Plan, and hereby expressly declared that the rights of the holders of said Participation Certificates shall be in all respects subject to the prior rights of the holders of Bonds and Collateral Notes to be at any time issued under the aforesaid First Mortgage, Consolidated Mortgage, and Collateral Note Agreement, in said Plan mentioned and provided for.

"Among other things, said Consolidated Mortgage embodies provisions limiting the application of the net earnings of the Railways Company to dividends on its stock and thereby the distribution of such dividends to and among the holders of Participation Certificates issued hereunder * * *.

"The Depositaries, from time to time, shall be entitled to receive and to collect all dividends or other income that may be declared or become payable on or by reason of all of the deposited securities. * * *

"Until the first day of August, 1912, and, to the full extent thereafter which may be permitted by law, until all the Consolidated Mortgage Bonds of the Railways Company which may be issued pursuant to the provisions of the Plan shall be fully paid and discharged, the Depositaries, or a majority of them, shall be entitled, subject to the provisions hereinafter contained, (1) to vote upon the said capital stock of Chicago Railways Company hereby transferred, and any and all other shares of stock which may at any time be held hereunder * * *.

"No plan or any modification thereof shall be operative, unless and until * * * approved by Peter S. Grosscup, and by John C. Gray * * *.

"The Railways Company agrees to accept said ordinance * * * as in this agreement provided * * *."

First Mortgage (Article III) :

"Sec. 1. As a material and substantial part of the security for the bonds issued and to be issued hereunder, and as a material portion of the consideration and of the conditions for the purchase and acceptance of said bonds by the holders hereof, * * * and that the rights and benefits granted to the Railways Company in and by the Ordinance, will be protected against forfeiture or impairment, or the danger thereof, and to the end that the value of the property hereby mortgaged and pledged may be fully conserved, it is hereby covenanted and agreed that (three persons) * * * and their * * * successors designated * * * as hereinafter provided, be and they are hereby constituted a Finance Committee, with the powers, duties and immunities hereinafter expressed."

"Sec. 4 (e) * * * *The ascertainment of the amount properly available for or applicable to the payment of dividends upon the capital stock of the Railways Company,* or otherwise distributable *to those having an interest in said stock, or the dividends thereon,* or the income therefrom, after making the payments to the City of Chicago and of interest charges and the several deposits mentioned in the Ordinance, *shall not be concluded or fixed* by any act, consent or acquiescence of or on behalf of, the Railways Company, in any instance, *except as may in writing be directed or approved* by the Finance Committee * * *.

"(b) No distribution of the earnings or income of the Railways Company, or of any part thereof, * * * shall be made until any such proposed distribution shall have been first approved by the Finance Committee."

Consolidated Mortgage (Article III, § 1):

" * * * Said sum of $250,000 per annum shall be applied as above provided, and any accrued deficiency or deficiencies in respect thereof shall be discharged, in all cases, before the application of any part of said earnings to the payment of dividends upon the shares of the capital stock of the Railways Company.

"After the above annual payment of $250,000 shall have been made in full, and any such deficiency or deficiencies in respect thereof, shall have been discharged, the Railways Company MAY, out of its said net earnings applicable to the payment of dividends upon its capital stock, pay or distribute as such dividends in each year (1) a sum not to exceed $246,400, cumulative, commencing with the year ending August 1, 1908, * * * etc."

The question presented may be stated thus: Under the contracts which fixed and determined the rights of the parties thereto, are the certificate holders (represented by appellants) entitled to payment in cash, or be given a lien on property or certain retired bonds of the railways company, equal to or greater than the lien of the bondholders, to an amount which represents the undistributed net earnings of the company since 1917? If the question be answered in the negative, we need not inquire into the relative position of the various certificates.

Questions arising out of this troublesome and vexatious case have been so frequently presented and decided by the courts that we shall, without discussion, state the conclusions which we have reached, and thereby narrow the contested issues presented by this appeal.

■ 1. The plan of reorganization adopted by the parties, ratified by the city of Chicago and approved by Judge Grosscup and Professor Gray, which grew out of the involved situation following the termination of the street car franchises in 1907 and the receivership of the operating company, determines the rights of the parties and the status of the various security holders. While the facts which occurred prior to the adoption of this plan may be viewed as a background upon which the documents must be read and construed, it is the agreements to which we must

look to ascertain the rights of both bondholders and certificate holders.

■ 2. In determining the relative position of certificate holders and bondholders, it is necessary to look to and construe as one document the ordinance, the plan of reorganization, the agreement of the parties, the language of the mortgage, and the terms of the certificates.

■ 3. The status of the certificate holders is not exactly that of a stockholder. Babcock v. C. Ry. Co., 325 Ill. 16, 155 N. E. 773; In re Babcock (C. C. A.) 26 F.(2d) 153. In some respects they occupied the positions of cestuis que trust, and the trustees were the individuals to whom all of the stock ($100,000) was issued when the company was organized and who under the plan remained the sole stockholders during the existence of the company. These stockholders may in a sense be called trustees for the certificate holders, but with equal propriety they could be called trustees for the city of Chicago, its citizens, the users of the street cars, and also those who advanced money to the railways company.

The unique practice of issuing all the stock to three individuals, who in turn issued thousands of certificates to the holders of the four different series, suggests that such certificate holders occupied an unusual position. It does not, however, as counsel for appellants argue, justify the conclusion that the framers of the plan intended to give to the certificate holders a status higher than that of the stockholders. It is to the stockholders that the certificate holders trace their title. How then may we ascribe to a certificate holder a higher position than the stockholder? As between the certificate holder and the mortgagee, such doubt, as might otherwise exist, is removed because the various instruments constituting the plan expressly provide that the lien of the certificate holders be subservient to the lien of the mortgagee (Ordinance, § 20), and the lien of the mortgage covers the earnings of the railways company.

■ 4. It was within the power of the railways company to provide that all earnings, after the payment of certain sums to retire bonds and to pay interest and fixed charges, might be subject to the first lien of certificate holders.

5. The railways company was a public utility whose revenues were wholly dependent upon its use by the public. The extent and character of its service to the public was not

a matter solely for it to decide, and the necessity for improvements and extensions depended largely upon the needs of a large growing city. Their necessity was not for the public utility alone to determine. During the life of the contract, the Illinois commerce commission came into existence, and the act creating it gave such commission authority to make and enforce certain regulations governing the operation and financing of the utility. Since the creation of the Illinois commerce commission, the improvements upon, and extensions to, the street car system were made only upon order of that commission. The railways company increased its fares for rides in excess of the contract price upon authorization of that commission. The net earnings here in question are traceable to the increased fares charged pursuant to the order of the commission. Without such increased fares there would have been no undistributed earnings over which the bondholders and certificate holders could contest. It is a legitimate conclusion, to be drawn from the record, that the increased fares would not have been ordered or later sustained by the court but for their necessity to provide funds from which improvements and extensions (here sought to be subjected to a lien) were made, and which extensions and improvements made possible better service to the users.

6. The certificate holders are estopped from now questioning the validity of any order of the commerce commission.

7. The certificate holders have not been guilty of any laches which prevent them from asserting their claims to the undistributed net earnings which have accumulated since 1917.

8. Under the law of Illinois, except in instances not here involved, the lien of a mortgagee does not extend to the earnings and income of the mortgaged property until legal proceedings are taken (usually by foreclosure and the appointment of a receiver), even though the mortgage covers the property *and the earnings and income thereof*. In the Matter of Wakey (C. C. A.) 50 F.(2d) 869, 75 A. L. R. 1521.

9. In the absence of an express provision, binding upon creditors, giving the stockholders a lien upon the net income and earnings of a corporation, such stockholders are not entitled, as a matter of right, to the distribution of net earnings through dividends. Undistributed net earnings reinvested by the company's officers in the company's property covered by a mortgage are subject to the lien of the mortgage.

In the light of these propositions, which somewhat narrow the controverted issues, we can turn our attention to the agreements to ascertain the extent of the right of the certificate holders to the undistributed net income of the railways company. The aggregate amount of such earnings with interest is approximately $10,000,000, most, if not all of which, have found their way into improvements, etc., on the railways plan or in paying off indebtedness incurred while making improvements.

The question thus presented naturally resolves itself into more limited issues. To illustrate: The mortgagee's claim to the income, after the maturity of the mortgage and after the commencement of foreclosure proceedings and the appointment of a receiver, is stronger than it is to the income earned before the default and before the mortgagee took legal action to subject such earnings to the lien of the mortgage. Concerning the mortgagee's right to the income earned after the maturity of the mortgage and subsequent to the appointment of a receiver, we have no doubt. The certificate holders' lien on the net income necessarily terminated with the contracts which gave it existence. In fact, two of the appellants do not make any claim to such earnings. Moreover, the court, in the foreclosure decree affirmed on appeal [City of Chicago v. Harris Trust & Sav. Bank (C. C. A.) 40 F.(2d) 612], so held.

As to the asserted lien on earnings acquired prior to the maturity of the mortgage, two pertinent questions arise: (a) The control of net earnings by the finance committee (section 4, art. III, first mortgage), and (b) the disposition of such net earnings as found their way into the property of the company, now that the property is to be distributed among all the security holders in accordance with their respective rights.

(a) Whether the certificate holder was entitled, under paragraph 4, article 3, of the plan, to an annual distribution of the net earnings as a matter of absolute right, was a question determined adversely to the certificate holder in Thatcher v. Chicago Rys. Co. (C. C. A.) 4 F.(2d) 63. Appellees argue that such decision is binding on the parties now before us. Appellants deny this decision is res adjudicata, and they argue further and at length that the previous decision is erroneous in its fact assumptions and in the propositions of law upon which it is based. We need not, and do not, decide whether this case is binding on us. It is certainly entitled to

great weight, for it clearly attempted to fix the status of certificate holders and mortgagees in regard to these undistributed earnings. We have again approached the question from the somewhat different angle of the individual counsel representing the various certificate holders, but our conclusion is the same as was reached in the Thatcher Case.

█ Sections 1 and 4 of article III of the first mortgage seem decisive. Those provisions seem consistent with the whole plan to rebuild, extend, and improve an inadequate street car system that it might meet the requirements of a rapidly growing metropolis. They wisely guarded against the unforeseen and unforeseeable conditions such as arose when the World War upset all businesses. Not only was the finance committee within its unquestionable rights when it ceased to direct the payment of dividends in 1917–1918 at a time when the revenues of the railways company were insufficient even to pay interest charges, but the members of the committee exercised their discretion wisely and in a manner which must meet the approval of disinterested observers who appreciate the fact that a public utility is under obligation to the public as fully, if not more so, than to its security holders.

█ But it by no means follows that, because the certificate holders were not entitled to a decree compelling distribution of earnings through dividends, they are not entitled to some protection (payments in cash or lien on the property) to the extent of such undistributed earnings now that the property is to be divided among the security holders.

█ Appellants' contention is builded upon paragraph 5, article III, of the modified plan of reorganization, and, in support thereof, attention is called to the word "shall" as used therein. That the word "shall" is not to be confused with the word "may" must readily be conceded. But the framers of the plan used the word "may" when referring to the declaration of dividends in another part of the agreement (article III, § 1, depositors agreement, under which certificates were issued), and its use therein is likewise significant. Moreover, the repeated provision in the various documents to the effect that the mortgages should be a prior lien upon the property, as well as the provision giving the mortgagees a lien on the earnings and income, is most persuasive. Sections 7 and 20, City Ordinance. Stronger language could hardly be found than in section 20 of said ordinance, which reads: "As against the City and any licensee of the City *and any and all*

*other persons* having or claiming to have any interest or benefit under this ordinance, the lien securing said bonds and obligations shall at all times be deemed and recognized to be a first lien upon the entire street railway system hereby authorized, including all rights granted to the Company by this ordinance." Construing all of the agreements together, the conclusion seems unavoidable that the framers of the plan, when using the word "shall" in paragraph 5, article III, of the modified plan of reorganization, were addressing themselves to the subject of the payment of *declared* dividends rather than to an attempted creation of a lien on earnings, which had not reached the declared dividend state. This clause 5 squarely fixed the relative positions of the four classes of certificates. It gave series 1 priority over series 2, 3, and 4 up to $8 per year. It required payment of up to $8 per year if and when dividends were declared. It did not, however, govern the declaration of dividends because the declaration of the dividends was specifically covered by article III, § 4, of the first mortgage. Neither did it create, nor attempt to create, a lien in favor of certificate holders upon undistributed earnings which had not been declared as dividends.

█ In reaching this conclusion, we have accepted the legal proposition that it was within the power of the corporation to create two classes of security holders, giving one a first lien upon the property and the other a first lien upon the income. Our inquiry has necessarily been directed to an investigation of the facts to ascertain whether the corporation, which had the power to thus protect each security holder, did in fact give to the certificate holder a first lien upon all the net earnings. In reaching the conclusion here announced, we have been influenced by the fact that the certificate holders' claims are derived through the common stock of the company; that each document expressly recognized the first lien of the mortgages upon the property; and it would require clear and express language (here absent) to create a lien in favor of stockholders (or of others whose rights are derived from stock) *to a first* or any other lien upon undistributed earnings of the corporation.

We have not ignored the argument advanced by the appellants to the effect that the payment of dividends out of earnings for the first ten years following the execution of the contract constituted a construction of the contract favorable to the position of the certificate holders. This argument loses much

of its persuasiveness in the light of the disclosed facts. Had there been no change in the economic conditions of the country resulting from the World War, had the Illinois commerce commission not promulgated rules and regulations governing the operation of utilities, doubtless dividends would have been continuously declared. But the reduced earnings, the orders of the Illinois commerce commission respecting extensions and improvements, made the passing of the dividends necessary in 1917 and 1918. Such being the situation, we are at a loss to understand how the previous declaration of dividends should be held to be an implied construction of the plan, particularly as against the bondholders who were not bound by the acts of the finance committee in declaring dividends.

The decree is affirmed.

GEIGER, District Judge (dissenting).

Thatcher et al. v. Chicago Railways Co. et al. (D. C.) was decided March 22, 1924, the trial court holding in substance that, under the plan of reorganizing street railways —the one now before this court—"the fact that there was a large surplus did not make the payment of such dividends mandatory, but merely gave certificate holders priority in the matter of dividends, and in the absence of bad faith or abuse of discretion the court could not substitute its judgment for that of the directors, finance committee, and stockholders." 297 F. 466.

This court, on reviewing such decision (and it is now suggested that its determination upon review has become either res adjudicata or so persuasive as to necessitate binding respect), significantly, so it seems to me, left open for consideration the very contention now, though perhaps for the first time, made on behalf of appellants. Nothing, in my judgment, makes this clearer than the later utterances of this court, when dealing with a petition for a mandamus to compel the trial court to permit intervention in the present law suit. For, notwithstanding all that had been said in elaborate briefs and extended judicial opinions in the litigation referred to in the majority opinion, this court, addressing itself to litigation which dealt—likewise for the first time—with the rights of all of the varied interests, after default and termination of the period for which the plan was devised, that is to say, with their rights *on liquidation,* said:

"These certificate holders are in decidedly unique situation. In an action wherein the question was directly involved, it was decided by the Supreme Court of Illinois that they were not stockholders, and were not entitled to the statutory and constitutional rights and privileges of Illinois corporation stockholders. Babcock v. Chicago Railways Co., 325 Ill. 16, 155 N. E. 773. But, while they are not stockholders, and there is no contractual provision for their ever becoming stockholders, they are collectively the holders of the entire ultimate beneficial interest in all of the stock, whereof the depositaries, who are not parties to the suits, hold only the bare legal title. These depositaries, during the 20 years since their creation, have elected the directors of the corporation, who likewise have no beneficial interest in the stock. While it is true this relation is contractual, duly assented to by all the certificate holders upon the exchange of their original stock holdings, these successive steps, and this distance between the beneficial owners and the directors, is such that in our judgment the usual relationship between directors of a corporation and its stockholders who choose them cannot, to the same degree, be here invoked to require the conclusion that these ultimate beneficial owners are, in fact, so directly and definitely represented by the directors as in the case of stockholders generally. The very relation thus suggests the advisability of permitting such an intervention as may tend to give assurance that in the litigation nothing of special interest to this peculiar class will be omitted or overlooked." In re Babcock, 26 F.(2d) 153, 156.

This was said by the court constituted as it was when delivering the judgment in the Thatcher Case (C. C. A.) 4 F.(2d) 63, 66, supra; and it is worthwhile to recur to what was said in the latter case respecting what "the plan said to the railways company," viz.: "By a certificate to be issued by you under a participation agreement between you and them, secure to them [the present participation certificate holders]: (a) All your right to whatever may hereafter be received *under any liquidation* of the Railway Company's assets; (b) all dividends upon your stock."

This was said argumentatively in negation of the proposition that the plan prescribed, mandatorily and without the possibility of intervening discretion, "dividends." And it is of interest that the court reached its conclusion upon the question, unanimously, the dissenting opinion being directed merely to the conceived necessity of having a *majority* of the certificate holders join in the proceeding

—apparently, *because the agreement so provided.*

The majority opinion now filed herein makes this observation upon the identical general theme.

"3. The status of the certificate holders is not exactly that of a stockholder. Babcock v. C. Ry. Co., 325 Ill. 16, 155 N. E. 773; In re Babcock (C. C. A.) 26 F.(2d) 153. In some respects they occupied the positions of cestuis que trust, and the trustees were the individuals to whom all of the stock ($100,-000) was issued when the company was organized and who under the plan remained the sole stockholders during the existence of the company. These stockholders may in a sense be called trustees for the certificate holders, but with equal propriety they could be called trustees for the city of Chicago, its citizens, the users of the street cars, and also those who advanced money to the railways company.

"The unique practice of issuing all the stock to three individuals, who in turn issued thousands of certificates to the holders of the four different series, suggests that such certificate holders occupied an unusual position. It does not, however, as counsel for appellants argue, justify the conclusion that the framers of the plan intended to give to the certificate holders a status higher than that of the stockholders. It is to the stockholders that the certificate holders trace their title. How then may we ascribe to a certificate holder a higher position than the stockholder? As between the certificate holder and the mortgagee, such doubt, as might otherwise exist, is removed because the various instruments constituting the plan expressly provide that the lien of the certificate holders be subservient to the lien of the mortgagee (Ordinance, section 20), and the lien of the mortgage covers the earnings of the railways company.

"4. It was within the power of the railways company to provide that all earnings, after the payment of certain sums to retire bonds and to pay interest and fixed charges, might be subject to the first lien of certificate holders."

Such opinion, after noting that the appellants as representatives of certificate holders are "free from laches in asserting their claims to the undistributed net earnings which have accumulated since 1907," proceeds: "Under the law of Illinois, except in instances not here involved, the lien of a mortgagee does not extend to the earnings and income of a mortgagor until legal proceedings are taken (usually by foreclosure and the appointment of a receiver), *even though the mortgage covers the property and the earnings and income thereof*"—citing

In re Wakey (C. C. A.) 50 F.(2d) 869, 75 A. L. R. 1521 (italics supplied) and:

"In the absence of an express provision, binding upon creditors, giving the stockholders a lien upon the net income and earnings of a corporation, such stockholders are not entitled, as a matter of right, to the distribution of net earnings through dividends. Undistributed net earnings reinvested by the company's officers in the company's property covered by a mortgage are subject to the lien of the mortgage."

The opinion then proceeds to estimate the Thatcher Case as involving the question whether a certificate holder was entitled under the plan *"to an annual* distribution of the net earnings as a matter of *absolute* right," and the conclusion is in the negative. And thereupon it is proposed to consider the question (without regard to res adjudicata or the great weight of that decision) "from the somewhat different angle of the individual counsel," etc.

Reference is made to the "decisive" terms of the first mortgage, their consistency with the "whole plan" to rebuild to the point of metropolitan adequacy a street car system; the prevision respecting "World War" possibilities; the wise endowment of power in a finance committee and its prudent exercise. However, the opinion proceeds: "But it by no means follows [apparently, notwithstanding the 'decisive' terms of the mortgage] that, because the certificate holders were not entitled to a decree compelling distribution of earnings *through dividends,* they are not entitled to *some protection* (payments in cash or lien on the property) to the extent of such undistributed earnings *now* that the property *is to be divided* among *the security holders."* (Italics supplied.)

Again: "In reaching this conclusion, we have accepted the legal proposition that it was within the *power of the corporation* to create two classes of security holders, giving one a first lien upon the property and the other a first lien upon the income. Our inquiry has necessarily been directed to an investigation *of the facts* to ascertain whether the corporation, which had the power to thus protect each security holder, did in fact give to the certificate holder a first lien upon all the net earnings. In reaching the conclusion here announced, we have been influenced by the fact that the certificate holders' claims are derived through the common stock of the company; that each document expressly

recognized the first lien of the mortgages upon the property; and it would require clear and express language (here absent) to create a lien in favor of stockholders (or of others whose rights are derived from stock) to a *first or any other lien* upon undistributed earnings of the corporation."

Disregarding for the moment any and all language of the "settlement" law and ordinances, or the agreements or any documents which may be seized upon as indicative of rank or priority of rights of any parties interested, it is perfectly clear that in 1907-08 —and that is the period when the parties spoke, and as of which the court is now called upon to determine what they *then said,* or (in equity) *intended to say or to have each other believe*—the situation, in which they found themselves, undeniably, was dominated by these considerations:

(1) The franchises of the then street car companies had expired.

(2) The companies, treating the situation as a traction entity, from either a capital or creditor standpoint were grossly insolvent.

(3) The physical properties were wholly deficient in upkeep and physical adequacy; and large amounts of capital were required for rehabilitation and extension purposes.

(4) New franchises had to be obtained.

(5) Municipal acquisition and ownership had to be provided for.

(6) The parties to the old situation had to be *satisfied*—in some way.

And with respect to the last three considerations, this court in the Thatcher Case, supra, observed: "Under the *compelling lash* of the city's refusal to grant any ordinance until *all interests were satisfied,* a plan accompanied by an agreement (called contract) was submitted and accepted, an ordinance expiring February 1, 1927, was granted, and a reorganization effected."

No reference need be made to the legislation or to the agreements and documents to establish that in any reorganization some sort of a corporation was assumed to be the necessary, and, in a practical way, the only, functionary to be selected for holding and operating these street car properties. But the plan adopted, in its every aspect, impressively exhibits a purpose to effectively proscribe the liberty of such corporation, if it may be so termed, in holding and operating the properties, in its financial structure, and, most of all, in *dealing with the avails of operation.* That is to say:

(1) A comprehensive and detailed plan for translating old liens against specific property into liens against the property in the new company's hands; and to acquire and give security for capital to carry out contemplated and necessary rehabilitation and extensions.

(2) A comprehensive and detailed plan for the application of gross earnings to operating expenses, upkeep, sinking funds, interest, and thereby *defined* any remnant as *net earnings;* and apparently to limit the application of both gross and net earnings.

If the solicitude manifested by this court in awarding mandamus to enable appellants to present their case is still to be felt, so that *"nothing of special interest to this peculiar class will be omitted or overlooked"* [In re Babcock, 26 F.(2d) 153, 156], there arises at the very threshold of the case the query, What, in a broad way, was the intent of the various parties in respect of a plan to *satisfy* the demands then probably made by them respectively? In attempting to answer, the order of consideration should not, preliminarily, involve picking out of documents the verb "shall" giving it mandatory force, only to be offset by disclosing the presence of the verb "may" in some other document, thereby to establish discretion, and thus assert the subordination of both "certificate" holders and "stockholders." That course, pursued by appellees, and in the majority opinion, in my judgment reflects obedience merely to an established and quite convenient circle. Therefore, if we start with the six considerations (and there probably are additional ones) as dominating the situation in 1907, and, for the present, consider the two outstanding features above noted, we discern not only that in the latter (the provisions for liens, and the provision for earnings) are found, conclusively, the dominant intent, but more importantly, that, in order to effectuate such inherent intent, in some way, the general liberty of an ordinary corporation with respect to earnings of necessity *had* to be, and clearly was intended to be, curtailed. Stating it somewhat negatively, what was the intent in carefully and comprehensively setting out and allotting *all earnings* if it was not to make them available and thereby to bring their *promise* to fruition? I am not concerned now whether language of any document, in form *guaranteed* dividends, or whether the language granted an *absolute* right or imposed an absolute duty of *annual or other stated* declaration and payment; nor whether, as the majority

opinion seems to conceive, as the test, a "first lien" or like conventional incumbrance was aroused by *clear* or *express* or in fact any language in documents constituting a part of the plan; nor whether the plan, though perfectly clear in its general intent and purpose respecting earnings, yet lodged a discretion exercisable consistently with the general intent, and, without impairment, as between parties of the *agreed status* and *applicability* of such earnings. But, as indicated, in equity the basic concern is the initial intent and purpose; and it is confidently asserted: That such intent is shown by the particular provisions expressly segregating earnings as a whole, then separating and allocating and giving them rank or priority, as between *all* parties. And here it is necessary to bear in mind the oft-repeated assertion found in the litigation which has persisted, including the present majority view, that appellant certificate holders are *not* stockholders, but that they have a purely *contractual* status. And surely, in order to meet the contention now made on the latter's behalf, the court cannot ignore or disparage the like concession heretofore so freely made that the plan, in truth, comprehended not only the concurrence of all parties, but that it consists largely of inducive offers by *adversary interests to each other,* which, when concurred in, were *expected and intended to be binding.* If, in pursuing this thought, we paraphrase the observation found in the Thatcher Case, i. e., what "the plan said to the company" to the query "What did the plan say to the certificate holders?" an apt response, in substance, is offered by appellants, viz. that it did *not* intend to say, and did not say, "You will be entitled to and will get these earnings, *if you get them."* And obviously, if appellants and the other security holders in the reorganization situation be regarded as having dealt severally and at arm's length with a corporation which, both in form and substance, is to be regarded merely as an ordinary corporation *with full liberty* or option in the future to function, freed from any real or even *apparent obligation of the plan,* a premise has been selected which dictates the conclusion. In that event language found in one of the documents, quoted in the majority opinion: "Among other things, said Consolidated Mortgage embodies provisions *limiting* the *application* of the net earnings of the Railways Company to dividends on its stock and *thereby* the distribution of such dividends to and among the holders of Participation Certificates issued hereunder," may be ignored promptly on the ground that the intent thereby reflected respecting *disposition of*

*earnings* (not whether it is an agreement to declare dividends) was not shared by *any one except those who took the certificates.* Likewise, the express language [quoted with italic emphasis in the Thatcher Case (C. C. A.) 4 F.(2d) 63, 64, 65] respecting the allocation of earnings, may all be brushed aside, even though in that case it is dealt with as reflecting the *purpose of the plan* in this very particular. In other words, in attempting to discern the intent of the plan with respect to the *status* of these certificate holders, *at this time,* either the Thatcher Case has no bearing whatever on the present question or, on elementary principles, this court could not have awarded mandamus to let them into this lawsuit. If this court had accepted then, as is now urged, the *clear* countervailing effect of a provision respecting priority of mortgages, or had ascribed to a finance committee the power, not to discretionally determine *time* of application of earnings, but their status, *on liquidation,* mandamus could never have been awarded.

Without attempt at further elaboration, the conclusion is again stated that the parties to the plan clearly disclosed an intent that the earnings coming to the corporation be made the subject of definite allocation; that that intent to be effectuated was and is in clear derogation of the ordinary discretion which corporate managers of *an ordinary corporation* have over earnings; and, proceeding from this point, it may well be conceded that the plan evidencing such intent may not be, or have been, "self-executing"; or that it did not give rights or remedies for its enforcement which were *absolute,* assertable at *fixed* or *other periods,* whenever it could be demonstrated merely that earnings had come into existence, and that the certificate holders would like to get them.

If therefore we recognize the general intent and purpose thus to deal with earnings, and that, presumptively at least, the parties must have mutually intended that at some time, in some way, the intent was to be effectuated or carried out, then *that* in this lawsuit for the first time affords opportunity to effectuate such intent. The majority opinion in my judgment falls very far short of meeting the tendered issue by proceeding to inquire respecting the presence of "clear language" compelling declaration of dividends; or language exhibiting a "first lien" or the like against these earnings; and, though apparently fully cognizant of the almost conclusive evidence of the intent we have been discussing, it attempts to avoid the conclusion

which is strongly impelled by setting up what seem to be real incongruities if not paradoxes.

It unreservedly adopts the view that these certificate holders "were not stockholders"; and it probably intends to recognize their "decidedly unique" situation. Yet, when called to answer the question: "If not stockholders, what are they?" notwithstanding the clear declarations of prior adjudications that they have a contractual status—and that should mean *contractual relationship to these earnings,*—the opinion rather mildly ventures merely that "In some respects they," these certificate holders, "occupied the positions *of cestuis que trust,*" that their "unusual" position arose merely out of "the unique practice of issuing all the stock to three individuals, who in turn issued thousands of certificates to the holders of the four different series." Plainly, the "beneficial interest" of these holders was not in mere *certificates* of *stock* whose "bare legal title" was held by others; nor should they be regarded as *cestuis* of a trust which comprehended no more than stock certificates; or that their contractual status was and is limited to an agreement to deposit ordinary stock *unrelated* to the antecedent and concurring acts, representations, and stipulations made, which show the comprehensiveness of a real trust, a trust much larger and dominant than an ordinary, impersonal corporation not bound to respect what the parties had agreed to—a plan.

Nothing is gained, in answering the question propounded by the certificate holders, by asserting that they derived their *title* from, or must trace it "to the stockholders"; for the whole inquiry is whether the whole plan was not of necessity unusual or unique. No one has thus far claimed that the reorganization plan was of a conventional type, or that the certificate holders had a unique position merely because they did not become holders of conventional engraved *stock certificates.*

If a court of equity can say "these certificate holders are not stockholders but we will measure their rights and liabilities solely with a stockholding yardstick," it is pursuing an evasive course, and in an arbitrary manner avoids the conclusion impelled, justly, by the premise that the rights rest in a contract manifesting an intent which, as heretofore suggested, was expected to be realized. Surely it is rather late to urge that the Supreme Court of Illinois and this court, in the cases, intended to say that these certificate holders were *cestuis* of stock in trust, that therefore they were stockholders *in substance* but not *in form,* wherefore no remedy was available, and that their contractual status did not create any rights other than such *unenforceable rights* as stockholders may ordinarily have—mere expectancies, realization of which may come quite fortuitously. I can find neither justification for, nor aid to support or to refute any contention in this case, in first reiterating a denial of a stockholding status, and then in effect saying that the certificate holders are *in substance* stockholders or their *cestuis,* nor by introducing the suggestion that there could have been no intent that such certificate holders have a status "higher" than *ordinary* stockholders. Characterizing the *scale* of the certificate holders as higher, lower than, or equal to, "stockholders," is of no avail in answering the question whether the *plan,* which in detail deals with earnings, allots them, and declares their "applicability" to be thus limited, reflects an intention that *that* should be done. The majority opinion, until it seems to answer that question by invoking the terms of the mortgage and the power of the finance committee, as hereinafter noted, apparently is unwilling to answer the question in the negative, but, cautiously observes that "it by *no means* follows" "that because the certificate holders were not entitled to a decree compelling distribution of earnings through *dividends,* they are not entitled to *some protection* (payments in cash or lien on the property) to the extent of such undistributed earnings, now that the *property is to be divided* among the security holders." So the opinion, first declaring that certificate holders are not stockholders, next suggests that, in a sense, they may be *cestuis,* but not to have ascribed to them a "higher" status than stockholders, yet may be entitled to *some protection*—now that the hour of liquidation has arrived. I am impressed with the purpose of the majority to concede that *apparently* these certificate holders have a relationship to these undistributed earnings, *and it must arise out of the plan,* regardless of their being *legal* or *equitable,* or any sort of stockholders. In other words, the plan exhibits such contemplated relationship as is a disclosure of rights, yet, so the opinion now intimates, the unique or nondescript character of these certificates does *not* lead to the conclusion that their rights are *not* susceptible of recognition and enforcement, or, as it is stated, "are not entitled to some protection." But merely denying a stockholding status to the certificate holders, or ascribing to them a position as *cestuis,* or even characterizing them as equitable stockholders, is far from defining their rights in either capacity, or, above all, eliminating the *plan,* as the *intend-*

ed measure of their rights. Nothing is gained by asserting their "title" traceable to stockholders or that they are in a derivative relation. That merely renews the inquiries: What if any rights was it intended to give them? Were they or were they not stockholders? Were there to be *any real* stockholders? Were there to be *any real* dividends in the sense of earnings which in *character, amount, time of distribution,* were within the discretionary range of an ordinary corporation or its officers, freed wholly from the dictates or behest of the *agreed plan?* In other words, was there a *real* corporation? Or was the whole machinery for holding, managing, and dealing with the avails of operation of these street car properties a device to carry out the adopted plan, and subservient to *its* stipulations? No answer, save that offered by appellant certificate holders, has been suggested to this question, which reasonably accounts for the adoption of the plan. No one has as yet suggested that the plan, in defining gross and net earnings, in allotting them to operating expenses, to interest, to sinking fund, to the city, was not, and was not intended *to be, mandatory.* And no one, nor the majority opinion, has ventured to say that the provisions "limiting a balance of net earnings to making payments" were or were intended to be merely advisory or precatory. True, these provisions in *limiting* the applications of earnings specify "dividends" on its, the corporation's, "stock," but that limitation most forcefully shows the purpose to limit power otherwise exercisable *over* earnings; and, so it seems to me, inescapably deals with the whole corporate machinery as a *device* for assuring these earnings to the certificate holders. And these questions significantly arise long before we get to a consideration of the verbs "shall" or "may," or to general, and, as the majority opinion demonstrates, *ineffectual,* terms of mortgages *covering physical* properties.

My interpretation of the majority view leads me to reduce it to these terms: These certificate holders are not stockholders; they may in a sense be *cestui que trust* stockholders; the plan allots earnings to them; but stockholders are not entitled to compel declarations of dividends; these earnings would first have to be converted into dividends; therefore the certificate holders have no rights so long as such conversion has not taken place. The result is that the plan fails, even on liquidation, if it appears that the "stockholders" who were set up without interest failed to get dividends, and, so the reasoning

is, they failed to get them because they were not entitled to them; and they were not entitled to them because *the corporation,* not the *plan, failed to agree* to give them. Hence, as previously intimated, the *plan,* though clear, not only never became effective, but the accomplishment of its objectives must have come about, not only fortuitously, but in the manner in which they would normally be accomplished *without any plan.* The majority being unable to reach a conclusion negativing the participating certificate holders' rights solely on the ground that they were not stockholders but in a sense *cestuis,* nor on the ground that in the plan there was *no* intent that they *should* participate, proceeds to find a ground for overriding such intent, by the terms of mortgages. But therein, it is believed a most palpable incongruity is introduced, thus: First, reference is made to the provision, an ordinary provision in mortgages, declaring its rank or priority; secondly, to a provision including "earnings" as mortgaged subject-matter. Thereupon the opinion proceeds to demonstrate, successfully, the futility of such a provision to *create a lien.* If it be so agreed, and it is, then plainly the right of a mortgagee to such earnings, after default and upon seizure (by foreclosure of the mortgaged subject matter), is cognizable, *not as absolute,* but, in equity, as an incident to *possession of property;* quite regardless of printed terms of a mortgage or anything else except the power to determine where, *equitably,* they should go. Thereupon the opinion, arbitrarily so it seems, adopts the view that such provision *evidences an intent* that the mortgagee should get *the past* earnings, whereas it is wholly ineffective to establish *right*—therefore it likewise evidences an intent that the certificate holders *should not* get them. Now, if it is the purpose to establish—taking a most favorable view for the mortgagee—that the case, on liquidation, as to these undistributed earnings discloses *two conflicting* intents, the one that these earnings were to go as the plan allotted them, the other that they go to the mortgagee, by virtue of the intent to be *imputed* to the clause of the mortgage, it is believed slight analysis will avoid and not sustain the majority conclusion. First of all the query arises, in view of the futility of such mortgage clause over undistributed past earnings, what intent can be ascribed to it or imputed, by virtue of it to *the parties?* Plainly, no intent whatsoever except that to be found *in its legal effectiveness,* which, as demonstrated, is limited to earnings accruing upon seizure. But, when the larger and dominat-

ing intent is now not only discerned but made effective against a clear conflicting intent, the conclusion is really that these earnings were *always mortgaged,* even those mandatorily dealt with in the plan for sinking fund, interest, and the like; and that this elaborate and detailed plan was legally ineffective except through the *grace of the mortgagee;* and the majority view in substance is that these earnings, though not *effectually* subject to the mortgage clause, prior to default, should now be regarded mortgaged *in intent,* and dominatingly so, notwithstanding the plan. Thereby the clause is given the very effect first denied to it. In my judgment, this is purely arbitrary, and ignores every element of the situation demanding endeavor to give effect to the intent so clearly manifested on behalf of the certificate holders in their relation to these earnings.

If, by way of test and further elaboration —we put the query—how, judging from the language used, was it intended that the plan *should* work, *in its lifetime* in respect of distribution of earnings? As has already been queried, during such lifetime, did the managers of the corporation conceive that they had the ordinary, quite untrammeled discretion to deal with earnings, or that they conceived themselves under the mandates of the plan? I am mindful of provisos lodging power to withhold or suspend the intended application of earnings on the score of "exigency," or "financial needs," but nothing could more forcefully reflect the *basic intent* normally to be effectuated respecting the limitations for use and distribution. There has been no complaint here that, in the operation of the plan, *mortgaged* earnings were diverted, to the prejudice of the mortgagee; or that, except as these certificate holders now appeal, there has been anything but obedience, not to the graciousness of the mortgagee, but to what is acknowledged to be the plan. The declared intended status and the *specifically limited applicability* of these earnings (except as now denied to the certificate holders) in all other respects has always been recognized and obeyed, not, as just indicated, upon *accidental discretion,* but by *virtue of the plan.*

It is my feeling that before these earnings can be denied to the appellants there should be a rational and fair answer to the questions, asked as of 1907–08, Why adopt *any* plan which, on its face, and if it is to be obeyed, so severely curtails the liberty of an *ordinary* corporation? Why adopt *any* such plan, if it created no rights of which a court of equity could take cognizance and bring within its power of enforcement? As has been indicated, an answer is not to be found in a search for *liens* or *incumbrances* upon or against these earnings, but rather in purpose and intent respecting their status, whereupon, in equity, the matter of right is determinable. It is but repetition to point out that, unless the situation, initially, be discerned to embody a plan to deal with the status of earnings, which in view of the limitations of the Illinois law *alone* could never have been made the subject of *lawful* and *true* "dividends," or unless the plan, regardless of the convertibility of "earnings" into "dividends," be respected as the means agreed upon to *satisfy* the parties mutually, and with the expectation that its terms created rights cognizable at *some time* when *earnings* were *susceptible* of distribution according to the agreed limitations, particularly *on liquidation,* or unless because of limitations of the plan upon corporation and its powers, the whole plan was in truth a device resorted to, then the question propounded by these certificate holders respecting any excuse for the plan must remain unanswered, particularly in the light of any purpose to provide a plan "just and fair." To now say that the mortgage, and the additional element next to be alluded to, upon arm's length bargaining, placed everything in subordination to *its* terms, seems a rather chilly response to an appeal in equity.

The majority finally suggests that the creation of a finance committee, endowing it with certain powers, is supportive of what has already been characterized as the "decisive" effect of the mortgages in denial of the certificate holders' claim to these earnings. The plain answer to this is: Certainly this committee was a functionary, if at all, bound to respect the plan; it was not at liberty either to *define, allocate,* or *distribute* earnings, gross or net, in derogation of such plan; by this is meant that such were not its general powers; and no one has claimed, on its behalf, that it had or was intended to have the power to supersede or override the plan in its purpose to declare the status and applicability of earnings, if and when they came into existence. Consistently with the Thatcher Case, such committee was not charged with obligation for *absolute* or *stated* distribution. But that again recognizes the *declared* basic status and applicability of the earnings, at *some time,* agreeably to the plan. To award to the committee, or other officers, unlimited discretion respecting time or circumstance of distribution, is far short of lodging power to

deny, either by act or failure to act, the *declared status*. And in my judgment the matter is not at all relevant to the question now before the court, viz., Where should these undistributed earnings *now* go? In other words, the court should not say, they should go to the mortgagee, because that is where the mortgage intended they should go and *because the finance committee did not act*.

It is my view that, when the parties initially expressed an intent dominating these earnings, then by conferring limited power upon a committee, or even the corporation, to defer or suspend their intended application, they did not contemplate that an exercise or failure to exercise such power must bring denial of intended applicability of such earnings, for *all* time. I feel that the judgment in this case should be reversed to the end that these certificate holders may receive equitable cognizance of their rights. Whether that shall be in a form of a decree for money, or, in whole or in part, ratably or preferentially through bonds redeemed by the use of earnings, is not open for discussion so long as the conclusion of the majority stands.